Eric E. BARRETT, Appellant,

v.

Katherine M. ALGUIRE, Appellee.

No. S–9934.

Supreme Court of Alaska.

Nov. 16, 2001.

Dennis L. McCarty, Ketchikan, for Appellant.

Loren K. Stanton, Ketchikan, for Appellee.

Before: FABE, Chief Justice, MATTHEWS, EASTAUGH, BRYNER, and CARPENETI, Justices.

### OPINION

CARPENETI, Justice.

## I. INTRODUCTION

Eric Barrett appeals the superior court's child custody determination changing primary physical custody of the parties' two children from him to Katherine Alguire (formerly Barrett). Because the superior court applied the correct legal standard to Katherine's motion to modify custody based on the changed circumstance of Eric moving out of Alaska with the children, and because the court's best interests findings were not clearly erroneous, we affirm the custody modification.

## II. FACTS AND PROCEEDINGS

Katherine Alguire and Eric Barrett were married in February 1988 in Metlakatla. Katherine is an Alaska Native from the Tsimshian tribe in Metlakatla, where most of her relatives still live. During the marriage, the parties had two sons: Tyler was born in June 1990, and Jeremy was born in July 1992. The boys were raised in Ketchikan.

In 1994 Katherine and Eric separated, but both remained in Ketchikan. During much of the separation Katherine had custody of the children. The parties filed a petition for dissolution in May 1996; their marriage was dissolved in August 1996. Eric took custody of the children prior to the dissolution and, as the parties agreed, was awarded primary physical custody when the dissolution was finalized. The parties noted in their child custody agreement that they were not setting a specific visitation schedule because they would "be able to amicably decide in the future on reasonable visitation times." The

parties agreed to joint legal custody. The superior court was not called upon to make a determination of the children's best interests. The parties' agreement did not envision the possibility that Eric would move out of Ketchikan.

Eric has a substance abuse problem. During the marriage, Eric was twice charged with driving while intoxicated—once in 1992 and again in 1995. Eric has been in detoxification programs on several occasions, but has had problems complying with aftercare programs. In early 1998 Eric went to Charter North in Anchorage for treatment for what he called depression, which he was dealing with by drinking too much.[1] Eric has been to KAR House in Ketchikan for alcohol related treatment. He also underwent counseling for a time beginning in April 1998.

From late 1996 until his departure for Washington, Eric was employed at the White Cliff School in Ketchikan as a teacher's aide for special needs children.

After the dissolution in 1996, Katherine had Tuesdays and Wednesdays off from work. Initially Eric gave her visitation with the boys one day a week, but he changed this to two days a week during her days off. In the fall of 1998, Jeremy's teacher, Kathleen Poulson, reported that Jeremy was tired in school. Eric decided that the boys should visit Katherine on the weekends instead of during the week on her days off, even though Katherine's work schedule would prevent her from seeing the boys much during their visits. Initially the change was to be for every weekend, but Eric soon decided that she should have the boys only every other weekend. Katherine's visitation remained at every other weekend until Eric moved to Washington with the boys.

In 1998 Katherine met John Alguire, a Ketchikan police officer. In early 1999 they married. John has three children from a prior marriage. John and Katherine also had a son together in 1999. They live in Ketchikan in a five-bedroom home. Their other children stay with them on differing schedules.

In April 2000 Eric decided to move to Shelton, Washington with the boys in order to return to school to get a teaching certificate. Several of Eric's family members live in Shelton.

On May 10 Katherine filed a motion to modify custody. She stated in her affidavit that she "believe[d] Mr. Barrett is going to be leaving Ketchikan for good at the end of the school year" but that he did not tell her the exact date he was planning on leaving. On May 22 Eric opposed her motion, claiming that Katherine had failed to allege a material change in circumstances justifying modification of custody. He acknowledged in his affidavit that he "hope[d] to attend college to obtain a teaching certificate" and that if he left Ketchikan he would likely move to Shelton. In her reply affidavit, dated May 26, Katherine argued that Eric's intended relocation supported her claim that a material change in circumstances existed.

On June 5 Eric and the boys left Ketchikan for Shelton, the same day that Katherine returned to Ketchikan from a previously planned trip to Las Vegas. Katherine did not have an opportunity to see the boys before they left.

On June 12 Superior Court Judge Michael A. Thompson issued an order concluding that Eric's move to Washington was a material change of circumstances, warranting a hearing on Katherine's motion, and setting a hearing for July 19. The hearing ultimately took place on August 24. The court ruled from the bench, concluding that, in light of Eric's move to Washington, the factors of AS 25.24.150(c) favored awarding primary physical custody to Katherine.[2] This conclusion

---

1. The parties dispute whether he completed this program. Katherine testified that Eric spent only two days at Charter North, while Eric testified that he spent seventeen days there and completed the program.

2. The court found that factors (1) [physical, emotional, mental, religious, and social needs of the child], (5) [length of time in stable environment and continuity of that environment], (6) [desire and ability to allow other parent to maintain open and loving relationship], and (8) [substance abuse] favored Katherine. The other factors were either evenly balanced between the parties—factors (2) [capacity and desire of parent to meet children's needs] and (4) [love and affection between parent and children]—or were not ap-

was based primarily on two grounds: (1) Eric had uprooted the children from what had been a stable environment that served the children's social, cultural, and emotional needs; and (2) Eric had a problem with alcohol abuse that he denied. Eric was awarded visitation during spring break as well as substantial summer visitation; the parties were to alternate visits during other holidays.

Eric appeals the award of primary physical custody to Katherine.

## III. STANDARD OF REVIEW

◼ Whether the superior court applied the correct standard of review is a question of law we review de novo, determining the rule of law in light of precedent, reason, and policy.[3]

◼ The trial court has broad discretion in determining child custody issues; resolution of those issues will be reversed "only if, after a review of the entire record, we are convinced that the trial court abused its discretion or that the controlling factual findings made by the trial court are clearly erroneous."[4] Improperly weighting certain factors may be an abuse of discretion.[5] Factual findings are clearly erroneous if, on the basis of the entire record, we are "left with a definite and firm conviction . . . that a mistake has been made, even though there may be evidence to support the finding."[6]

## IV. DISCUSSION

A. The Superior Court Applied the Correct Legal Standard.

◼ Eric argues that the superior court improperly treated Katherine's motion as if it were an initial custody proceeding instead of a modification proceeding. He contends that the trial court must apply a three-step analysis when determining whether to modify custody. Eric also argues that Katherine had a heavy burden to prove that modification was warranted, which she did not satisfy. We disagree on all points.

1. Custody modification requires that two conditions be satisfied.

◼ Eric contends that there is a three-step analysis for modification of custody: (1) a material, substantial change must exist relative to the prior custody arrangement; (2) the change of circumstances must require modification; and (3) the modification must be in the best interests of the child. However, as we have repeatedly held,[7] Alaska law establishes only two conditions that must be satisfied before a motion to modify custody will be granted: "An award of custody of a child or visitation with the child may be modified if the court determines that a change in circumstances requires the modification of the award and the modification is in the best interests of the child."[8] (The second of those conditions incorporates the last two steps suggested by Eric.) We turn to these two conditions now.

a. Changed circumstances

◼ The non-custodial parent must first establish that a change in circumstances has occurred.[9] "The required change in circumstance must be significant or substantial, and must be demonstrated relative to the facts and circumstances that existed at the time of the prior custody order that the party seeks

---

plicable—factors (3) [preferences of the children] and (7) [domestic violence].

3. See McQuade v. McQuade, 901 P.2d 421, 423 (Alaska 1995) (citing Cox v. Cox, 882 P.2d 909, 913 (Alaska 1994)).

4. Jenkins v. Handel, 10 P.3d 586, 589 (Alaska 2000).

5. See Borchgrevink v. Borchgrevink, 941 P.2d 132, 134 (Alaska 1997) ("An abuse of discretion has occurred if the superior court considered improper factors in making its custody determi-nation, failed to consider statutorily mandated factors, or assigned disproportionate weight to particular factors while ignoring others.").

6. Jenkins, 10 P.3d at 589.

7. See id.; Valentino v. Cote, 3 P.3d 337, 340 (Alaska 2000); Nichols v. Mandelin, 790 P.2d 1367, 1372 (Alaska 1990); S.N.E. v. R.L.B., 699 P.2d 875, 878 (Alaska 1985).

8. AS 25.20.110(a).

9. See Jenkins, 10 P.3d at 589.

to modify." [10]   The moving parent bears the burden of making a prima facie showing of a substantial change of circumstance as a threshold matter.[11]

■■■ We have held that "a custodial parent's decision to move out-of-state [with the children] amounts to a [substantial] change in circumstances as a matter of law." [12] Thus, the moving party is entitled to a hearing on a motion to modify custody as a matter of law based on a showing that the custodial parent has moved or intends to move.

In this case, where the parties' prior custody agreement makes no mention of the possibility that Eric might relocate outside of Alaska, Katherine met her threshold burden of showing a material change in circumstances—Eric not only indicated his desire to relocate, he did relocate out of state with the children.

### b.   *Best interests of the child*

■■■ Once the moving party makes the threshold showing of a material change in circumstances in a case where there was no prior judicial determination of the children's best interests, then the moving party is entitled "to a hearing to consider whether,

in light of such changed circumstances, it is in the child's best interest to alter the existing custodial arrangement." [13]   In cases where one parent chooses to relocate outside Alaska, particularly where the parties' prior custody agreement makes no mention of this possibility, the court must determine the custody arrangement that is in the best interests of the child under the criteria stated in AS 25.24.150(c),[14] including assessing whether there are legitimate reasons for the move.[15]   "The court is to assess the best interests in light of all of the relevant factors, including the impact of the move on the child. . . . [T]he custody determination must be made in light of each parent's situation, including relocation." [16]

Eric cites numerous cases for the proposition that changed circumstances must be substantial relative to the circumstances at the time custody was previously determined. This is correct.[17]   Eric then argues that his move out of state is not, of itself, sufficient to warrant modifying custody.  But this argument ignores the fact that once changed circumstances are shown (such as his relocation with the boys), the superior court is then obligated to conduct a best interests analysis, which includes consideration of the reasons for relocation.[18]   The query on appeal then

---

**10.**  *Id.* (internal citations omitted).

**11.**  *See Harrington v. Jordan*, 984 P.2d 1, 3 (Alaska 1999); *Long v. Long*, 816 P.2d 145, 150 (Alaska 1991) (citing *Lee v. Cox*, 790 P.2d 1359, 1361 (Alaska 1990)).

**12.**  *Acevedo v. Liberty*, 956 P.2d 455, 457 (Alaska 1998) (citing *House v. House*, 779 P.2d 1204, 1207–08 (Alaska 1989)).

**13.**  *Lee*, 790 P.2d at 1361.

**14.**  AS 25.24.150(c) provides:
The court shall determine custody in accordance with the best interests of the child under AS 25.20.060—25.20.130.  In determining the best interests of the child the court shall consider
(1) the physical, emotional, mental, religious, and social needs of the child;
(2) the capability and desire of each parent to meet these needs;
(3) the child's preference if the child is of sufficient age and capacity to form a preference;
(4) the love and affection existing between the child and each parent;
(5) the length of time the child has lived in a stable, satisfactory environment and the desirability of maintaining continuity;

(6) the desire and ability of each parent to allow an open and loving frequent relationship between the child and the other parent;
(7) any evidence of domestic violence, child abuse, or child neglect in the proposed custodial household or a history of violence between the parents;
(8) evidence that substance abuse by either parent or other members of the household directly affects the emotional or physical well-being of the child;
(9) other factors that the court considers pertinent.

**15.**  *See McQuade v. McQuade*, 901 P.2d 421, 424 (Alaska 1995); *House*, 779 P.2d at 1208; *see also Moeller–Prokosch v. Prokosch*, 27 P.3d 314, 316 (Alaska 2001).

**16.**  *See Moeller–Prokosch*, 27 P.3d at 317.

**17.**  *See, e.g., Jenkins v. Handel*, 10 P.3d 586, 589 (Alaska 2000).

**18.**  *See McQuade*, 901 P.2d at 423 n. 6 & 424 ("Thus, in making a custody determination where the existing custodial parent chooses to

becomes whether the trial court's determination as to the best interests of the children, under all of the relevant statutory factors, is an abuse of discretion or clearly erroneous, not whether the move in and of itself warrants modification.

■ Eric also appears to argue that the trial court's finding that he had been doing a good job parenting the boys means that there were no changed circumstances warranting modification of custody and that the trial court erred by ordering the change in custody based on his move to Washington. But because a custodial parent's decision to relocate constitutes changed circumstances as a matter of law, the length of time the children have been with the custodial parent is merely one of the factors the court considers in making its best interests determination.[19]

The trial court in this case properly applied the legal standard for a custody modification where one parent chooses to relocate outside Alaska. After Katherine met her threshold burden of showing changed circumstances based on Eric's relocation out of state with the boys, the court held a hearing on Katherine's motion to modify custody. The trial court made findings under each of the factors of AS 25.24.150(c), in light of Eric's move to Washington and its impact on the boys. The court heard extensive evidence with regard to Eric's ability to parent, his problems with substance abuse, his failure to allow Katherine the liberal visitation she thought she would get under their initial agreement, as well as evidence of Katherine's ability to provide for the children, and the environment in which they had grown up.

The court concluded that factors (1) physical, emotional, mental, religious, and social needs, (5) stability and continuity of the children's environment, (6) ability to allow the maintenance of an open and loving relationship between the children and the other parent, and (8) substance abuse, favored Kath-

erine; that factor (7) domestic violence, was not applicable; and that the parties were equal as to factors (2) parents' ability to meet children's needs, (3) children's preferences, and (4) love and affection between parent and children. The court also considered the impact of the move on the children, especially with regard to the factor of desirability of continuity, as well as the legitimacy of the reasons for the move, when it concluded that the best interests of the children required awarding custody to Katherine.

2. *The legal standard for custody determinations when one parent relocates out of state is the same for initial and modification determinations.*

Eric contends that there are different requirements for an initial custody determination and for a modification of custody, and argues that because the court treated this as an initial custody determination, reversal is warranted in this case. This argument is without merit. In *McQuade v. McQuade*[20] we held that the legal standard in custody cases where one parent chooses to relocate is the same whether the superior court has an initial custody determination or motion to modify custody before it. We reiterated this principle recently in *Moeller–Prokosch v. Prokosch.*[21]

B. *The Superior Court Did Not Err in Determining the Best Interests of the Children.*

Eric contends that the superior court erred when it: (1) began its determination by not giving the prior custody agreement sufficient weight; (2) failed to give adequate weight to Eric's ability to parent the children; (3) incorrectly considered the stable environment factor when it failed to consider that there was no evidence of an adverse effect on the boys from the move to Washington and when it gave too much weight to the cultural and social need of the boys to be

move out of state, a court must consider the best interests of the children by applying the criteria in AS 25.24.150(c), and in so doing should consider whether there is a legitimate reason for the move.").

19. *See* AS 25.24.150(c)(5).

20. 901 P.2d at 423 n. 6.

21. 27 P.3d at 316.

near their Tsimshian relatives; and (4) gave too much weight to evidence of substance abuse that was out of date and immaterial, especially given the favorable testimony of Eric's co-workers.

Katherine argues that the court's findings are supported by the record, are not clearly erroneous, and that the court did not abuse its discretion. We agree.

### 1. The prior custody agreement

■ Eric argues that his previous custody of the children should have been given more weight. But the trial court was not required to do so. Alaska Statute 25.24.150(c) sets forth the factors the court is to consider in custody determinations, including those factors that "the court considers pertinent." [22] While the parties' custody agreement "has no binding force on the court ... [because t]he court must independently determine what arrangement will best serve the child's interests," [23] especially in a case where circumstances had changed because of the custodial parent's decision to move out of state, a trial court in these circumstances should give a prior custody agreement the weight it deserves in light of all the events that have transpired since it was entered.

The trial court's treatment of the prior custody agreement was not an abuse of discretion. The trial court stated that "[t]his is the long postponed trial in this case, this is what should have happened in 1996." The court made it clear that because it found that the initial agreement "did not in fact entirely represent or reflect [Katherine's] understanding of what it was supposed to be," [24] the court did not "give the original agreement very much weight." The court stated that it would treat the parties as "largely equal, except as previous conduct has an

impact on the factors listed in [AS] 25.24.150." This was not an abuse of discretion.

The court also found that Eric had inappropriately ignored Katherine's desire to exercise the visitation she thought they had agreed to. This finding is supported by the record. Katherine testified that at the time of the parties' dissolution, she thought she was agreeing that she would have liberal visitation with the two boys. She also testified that Eric thereafter made decisions about changes in the visitation schedule without consulting her. Eric testified on both direct and cross-examination that he told Katherine what the visitation schedule would be. He also testified that he told Katherine he was going to leave Ketchikan but not when. The court found that because Eric had custody, he had control over the children and that he did not "go out of his way" to allow Katherine to cultivate a relationship with the boys. This finding is not clearly erroneous.

■ The superior court was not required to accord the parties' agreement great weight. And we "give due regard to the trial judge's opportunity to judge the credibility" of the witnesses [25] because, in this case, the court's decision to accord the initial agreement little weight was based in part on the testimony of the parties. We therefore conclude that the trial court did not abuse its discretion in the weight it accorded the prior custody agreement.

### 2. Ability to care for the children

■ Eric's contention that the court did not give adequate weight to his parenting skills, and the four and a half years that he exercised those skills, is unsupported. The

---

**22.** AS 25.24.150(c)(9).

**23.** *McClain v. McClain*, 716 P.2d 381, 385 (Alaska 1986) ("Trial courts, not parents, are the ultimate decision makers as to custody and are not bound by private agreements.... Courts have sometimes refused to be bound by custody stipulations even when both parents stand by their agreement.").

**24.** Katherine testified that she had believed that she would be allowed liberal visitation but that

what in fact had occurred was that Eric controlled visitation without consulting her. Eric did not deny that he had told her what visitation would be, that he changed it at his whim, and that he did not discuss his pending move with Katherine in any detail.

**25.** *See Evans v. Evans*, 869 P.2d 478, 480–81 (Alaska 1994) (citing *Parker v. Northern Mixing Co.*, 756 P.2d 881, 892 (Alaska 1988)).

trial court found that the parties were equal with respect to factor two—the capacity and desire of the parent to meet the needs of the child,[26] concluding that both Eric and Katherine had demonstrated the ability to care for the children. While there was little negative evidence as to Eric's ability to parent, there was no negative evidence as to Katherine's parenting skills.[27] The court's finding that the parties were equal on this factor is supported by the record.

The witnesses offered by Eric to support his parenting ability were all professional acquaintances who saw him in settings outside the home, such as work or social gatherings. Kathy Poulson worked with Eric and had taught his children. Terri Robbins was a special needs teacher who also had worked with Eric and observed him at work. Maggie Freitag was a classroom volunteer and her daughter was a friend of the parties' boys. Adrianna Moss was a teacher at White Cliff School who had observed Eric at work and around his children. None of these witnesses had seen Eric under the influence of alcohol, although both Kathy Poulson and Terri Robbins knew that he had received treatment for alcohol abuse.

Eric's former girlfriend, Lori Ann Thomas, was subpoenaed by Katherine to testify. Lori Ann met Eric in 1996; they started dating in 1997. They dated, on and off, for approximately fifteen months, with the relationship ending near the end of 1998. Over the course of their relationship, Lori Ann had the opportunity to observe Eric in his home, and she testified that his drinking problem had a negative impact on the children. Her testimony concerning Eric's substance abuse problem is discussed in more detail below.

On her own behalf, Katherine testified that she wanted to care for both of her boys. No evidence that Katherine could not care for the children was presented.

Eric contends that there was no negative evidence regarding the social or educational development of the boys. But the court properly took into account the boys' satisfactory development, Eric's parenting skills, and the care he had given them. The finding that this factor was neutral because both parents were equally capable of parenting the children is thus not clearly erroneous. The weight the court accorded this factor was not an abuse of discretion.

### 3. Stable environment

Eric contends that the trial court erred when it concluded that the children's stable environment was their community in Ketchikan, not the home Eric provided. We disagree. The trial court's consideration of the stability of the children's environment in a custody modification case can encompass a multitude of factors, including, but not limited to, the relationship with the custodial parent, the home provided by the custodial parent, the children's school, the community of friends and family, the cultural community, and the children's relationship with the non-custodial parent. It also includes stability of place.[28] The trial court's difficult task is to examine all of these factors and determine, in each case, which predominate. Here, Judge Thompson found that maintaining the children's relationships with their school, community of friends and family, the cultural community, and their mother outweighed maintaining the relationship with their father. This decision was not an abuse of discretion. As we stated in *House v. House*, "[t]he purpose of maintaining stability in custody arrangements is . . . defeated by the custodial parent's decision to leave Alaska."[29]

**26.** AS 25.24.150(c)(2).

**27.** The court also found that Katherine's capability to meet the children's needs might exceed Eric's because of her new home and nuclear family—but the court expressly found the parties to be equal on this factor and thus did not give Katherine any preference due to her remarriage. *See West v. West*, 21 P.3d 838, 843 (Alaska 2001) (concluding that "custody should not [be] determined by an expressed preference for the advantages of a 'two-parent household'" without case-specific evidence).

**28.** *See, e.g., Elliott v. Settje*, 27 P.3d 317, 320–21 (Alaska 2001); *Evans*, 869 P.2d at 482.

**29.** 779 P.2d 1204, 1207 (Alaska 1989) (holding that decision to move out of state with children constituted material change in circumstances because of "potentially disturbing and upsetting

### a. The move to Washington

Eric argues that there was no evidence of a negative impact on the boys from the move. But the court was required to consider all factors that "directly affect the well-being of" the children,[30] and the absence of negative impact from the move does not automatically mean that custody should remain unchanged. The same is true for the length of custody in the context of the "stable environment" factor. Both are factors the court is to consider in its bests interests analysis—and that is what was done here.

Moreover, Eric's argument ignores several impacts of the move on the boys: the restrictions on their ability to see their mother and to have access to their native heritage and the community in which everyone agreed they had developed so well. In this case, the court found that Eric's relocation was a substantial change in circumstances, and the change was magnified, because the parties did not have the money to fly back and forth between Alaska and Washington. The visitation arrangement would thus be severely impacted by Eric's move. The court also found that the evidence showed that the "stable environment" provided for the boys by Eric was not his actual home, but instead was based in their school and community of friends and relatives in Ketchikan, and that it was Eric who was changing that stable situation. The court found that even though Eric had "perfectly sensible reasons for leaving" it was the best interests of the children that the court was considering, not Eric's. The court then concluded that had Eric chosen to remain in Ketchikan, the parties would have been equal on this factor but because Eric had chosen to leave and uproot the children, Katherine had gained "a small edge" regarding this factor. This conclusion is supported by the record.

Three of Eric's witnesses testified that they thought both of the boys were doing well at White Cliff School and would continue to do so. None of these witnesses had any knowledge of the impact of the move on the boys. Terri Robbins thought the boys would do well if they remained at White Cliff School.

As discussed below,[31] the court found that while the boys would have access to various native tribes in Washington, such access was not as meaningful to the boys as the proximity to the Tsimshian culture they would have in Ketchikan.

The court was also troubled by Eric's failure to include Katherine in the decision to move. Eric testified that he told Katherine, over the phone, about the move but not about what date he had in mind. And he left Ketchikan with the boys, knowing Katherine was out of town on a trip, without telling her when he would be leaving.[32]

While Eric has family in Shelton to whom the boys had previously had some access, all the evidence showed that the boys were doing well in a good school in Ketchikan, that the boys' Tsimshian culture would be absent from their life in Shelton, and that Katherine could care for them.

The court's determination of what custody arrangement is in the best interests of the boys requires it to consider all of the factors that "directly affect the well-being of" the children,[33] not merely whether the move to Shelton will adversely affect the boys. The court's finding that keeping the boys in Ketchikan was better for them than moving to Shelton is supported by the record.

### b. Native ancestry

The other significant basis for the court's custody determination was the court's finding on factor five that, in this case, the·

---

change" warranting hearing on issue to determine children's best interests).

30. AS 25.24.150(d).

31. *See infra* Part IV.B.3.b.

32. Katherine testified that she only knew of the impending move because Tyler told her. When she asked Eric about the move, he would not tell her when he would be leaving. Katherine had asked Eric about switching weekends with the boys to accommodate a trip she was taking to Las Vegas. But he left with the boys the same day she returned from her trip, and it was not possible for the boys to see her before they left.

33. AS 25.24.150(d).

stable environment was the children's school and social surroundings in Ketchikan, not the home Eric provided, and that Eric was the one disrupting that stability. The superior court concluded that "social" needs include "cultural" needs, and that living in Washington and having access to northwest coast tribes, but not the boys' Tsimshian culture in Metlakatla, was insufficient to meet this social need of the children.

Eric argues that there was no evidence that Katherine had tried to bring the boys into their native culture. But Katherine testified that the boys had seen their Tsimshian relatives on at least two occasions, that she would expose them to that culture more if she had custody, and that she believed it to be an important part of their upbringing that they would not get in Washington.

The superior court's finding that proximity to the Tsimshian culture was an important part of the boys' social needs is not clearly erroneous. It is uncontroverted that in Washington they would be exposed only to various northwest coast tribes, not their Tsimshian culture. And both parents agreed the boys' native heritage was an important element in their upbringing.

### 4. *Substance abuse*

■ Eric argues that the court gave too much weight to evidence of substance abuse and his problems with alcohol, noting that there was no "recent, competent, material evidence" as to any adverse effect on the boys. Because Eric has an established problem with alcohol abuse, and because there was evidence of continued drinking and denial on Eric's part as to his alcohol problem, we conclude that the trial court did not abuse its discretion in weighing this factor. The court's consideration of Eric's use and abuse of alcohol, especially with regard to his attitude towards an established substance abuse problem, was appropriate because there was evidence that his conduct had directly affected the boys and there was no evidence of substance abuse by Katherine.

The superior court found that Eric was in denial about his problem with alcohol and that his failure to complete treatment programs coupled with two DWI convictions jus-

tified weighing this factor heavily against him. This was neither clearly erroneous nor an abuse of discretion. Katherine testified that Eric frequently drank to the point of intoxication during their marriage. Both Katherine and her husband testified that they had, on separate occasions after the dissolution, seen Eric in an intoxicated state and when he "had been drinking." On at least one of the latter occasions, he had the children with him and was driving.

Lori Ann Thomas, who was formerly involved with Eric in a dating relationship during 1997 and 1998, testified that Eric was a "wonderful nurturing father, for the most part." But Eric incorrectly claims that she provided "no evidence of any adverse impact upon the boys from any alleged consumption" of alcohol. Lori Ann testified that their relationship was tumultuous because of Eric's alcoholism. She stated that his drinking "was out of control," that on one occasion he had left the house after Thanksgiving dinner in 1997 at around 9:00 p.m. and went to a friend's house where he remained, drinking, until 3:00 in the morning. Lori Ann also testified that after Eric's return from Charter North in early 1998, they became involved again but that he continued to drink. She recounted an incident in April of 1998 when Eric kept the boys home from school, went on a drinking binge and passed out at his home. Lori Ann left work that morning and took the day off to help Eric; she "took him to Gateway to talk to a counselor there, who recommended that he go into KAR House." She testified further that Eric was a secretive drinker but that he drank in front of the children, and that she believed it affected his children negatively.

While direct evidence of Eric's drinking was over two years old at the time of the hearing, circumstantial evidence of Eric's use of alcohol was less than one year old at that time. Lori Ann testified that only a couple of months before the hearing she saw him purchase a twelve-pack of beer from a liquor store and then drive away with the boys. Indeed, she testified that the reason she broke up with Eric was because he was drinking while caring for her son.

When asked whether or not he had a problem with alcohol, Eric expressly denied ever

having had a problem with alcohol, despite his acknowledgment of having been in several treatment programs for alcohol abuse. And Eric's credibility was impeached on several occasions, most notably with regard to his denial of an alcohol problem and his denial of having been charged and convicted of driving with a revoked driver's license.[34]

The trial court did not believe Eric's testimony that he had no substance abuse problem. The court found that Eric had a problem with alcohol abuse, that he was in denial about that problem, and that this weighed heavily against him in the best interests analysis. Eric's proven alcohol problem was properly weighed against him, once the court found that it directly affected the boys. The trial court's findings are supported by the record and are not clearly erroneous. The weight given to this factor was not an abuse of discretion.

## V. CONCLUSION

Because the trial court applied the correct legal standard for custody cases where one parent chooses to relocate out of state, because its findings are supported by the record and are not clearly erroneous, and because the weight the trial court gave the statutory factors was not an abuse of discretion, we AFFIRM.

---

**34.** In 1998 Eric was charged and convicted of driving without a valid driver's license, a misdemeanor. 1KN–98–1005CR.