**Sharon A. McLANE, Appellant,**

v.

**Chad B. PAUL, Appellee.**

No. S–12872.

Supreme Court of Alaska.

Aug. 1, 2008.

---

Jason A. Weiner, Terrance W. Hall and Associates, Fairbanks, for Appellant.

Margaret O'Toole Rogers, Foster & Rogers, LLC, Fairbanks, for Appellee.

Before: FABE, Chief Justice, MATTHEWS, EASTAUGH, CARPENETI, and WINFREE, Justices.

*OPINION*

FABE, Chief Justice.

## I. INTRODUCTION

When Chad Paul and Sharon McLane divorced in 2006, they entered into a court-approved settlement agreement granting Sharon physical custody of their six-year-old daughter Alexis during the school year in Alaska and Chad summer visitation in Illinois. While Alexis was with Chad for the

summer visitation, Chad suggested to Sharon that they reverse their custody arrangement. The parties discussed this possibility through the end of the summer, but Sharon refused to formalize a custody change and insisted that Alexis be returned to her. Chad then filed a motion for modification of custody and Sharon filed a motion for enforcement of the settlement agreement. The superior court granted Chad's motion for modification, awarding him school-year custody and granting Sharon summer visitation. Sharon appeals. Because a modification of custody requires a substantial change in circumstances, and because no substantial change of circumstances was demonstrated here, we reverse the modification of custody awarding Chad custody during the school year.

## II. FACTS AND PROCEEDINGS

Chad Paul and Sharon McLane were married on February 14, 1999 and divorced on June 20, 2006. Their daughter, Alexis Rose, was born on November 13, 2000. Before the divorce was final, Chad and Sharon signed a settlement agreement drafted by Sharon's counsel. Among other things, the settlement agreement divided the marital property and provided for spousal support. The settlement agreement also incorporated a parenting plan through which the parties agreed to share legal custody of Alexis, providing Sharon with primary physical custody and giving Chad scheduled summer and holiday visitation. The parenting plan was drafted by Chad without the aid of legal representation.

The settlement agreement required that custody modifications would be in writing, signed by both parties, or by court order. The parenting plan allowed flexibility "for special events, changes in circumstances and to adjust to Alexis'[s] schedule" if both parties agreed, but provided that the parties' agreement remained in effect when the parties did not agree to a change.

Shortly after he signed the settlement agreement, Chad moved to Illinois. The parties had anticipated this move and included provisions in the settlement agreement that would take effect when Chad and Sharon lived in different communities. The settlement agreement and parenting plan were incorporated into the divorce decree on June 20, 2006. In early 2007 Chad remarried; his new wife had two young children from a previous relationship.

In June 2007, while Alexis was with Chad in Illinois for summer visitation, Chad suggested to Sharon that they reverse their agreement to give Chad school-year custody. Discussions on this topic took place throughout the summer. In late July Sharon sent Chad $2,000 that she described as child support for Alexis, along with some school clothes. Chad drafted a revised parenting plan to reverse the custody arrangement and mailed it to Sharon. But Sharon never signed the paperwork modifying custody.

On August 20, 2007, Alexis started first grade in Illinois. Two days later, Sharon called Alexis to ask how school was going. According to Sharon, Alexis said she wanted to come back to Alaska. Sharon then heard Chad talking to Alexis in the background, and Alexis told her mother, "I got to go, Daddy's mad." Sharon concluded that Chad had been monitoring her phone calls with Alexis, thwarting Alexis's attempts to tell Sharon that she wanted to return to Alaska. Soon afterward, Sharon told Chad that she would not agree to modify the custody arrangement and insisted Alexis be returned to Alaska.

Chad filed a motion to modify custody on August 27, arguing that the alleged informal agreement to allow Alexis to remain in Illinois constituted a substantial change of circumstances. Chad offered his e-mail correspondence with Sharon as proof of the alleged informal agreement. The same day, Sharon filed a motion to enforce the existing custody agreement and to return Alexis to Alaska. She argued that Alexis should have been returned on July 29, and that despite her willingness to consider a different arrangement, the existing agreement remained in effect because no modification had been agreed to in writing, as the settlement agreement required. In her opposition to Chad's motion for modification of custody, she also contended that her e-mails with Chad were protected settlement negotiations and inadmissible under Alaska Rule of Evidence 408.

The motions were considered on an expedited basis, and on August 29 the superior court held a hearing at which Sharon and Chad were the only witnesses. After a short recess, the superior court issued its decision from the bench, finding that Sharon and Chad had agreed that Alexis would remain in Illinois for the school year, although the agreement had not been placed in writing or formalized and Sharon had later changed her mind.

The superior court then analyzed Alexis's best interests, concluding that the parties were "even-steven" on the factors listed in the statute and that they were equally capable and loving parents. It nonetheless granted the modification of custody in Chad's favor, stating:

> I believe and I find that a decision was made for Alexis to stay and that Sharon thought differently and changed her mind late. Now, that's usually what a writing is for. It's so that people actually have a written signature that helps them realize, this is the point of no return. . . .

> In this case, though, I believe that the point of not returning—the decision point was reached earlier and that was when Alexis was not returned[,] when school clothes were sent, money was sent, and that the decision was made.

> And based upon this finding . . . and the child's expectations at this point . . . it is appropriate to modify the custody . . . so that Alexis stays with Mr. Paul for this school year with the visitation as the parties have agreed.

The superior court went on to clarify that the modification was temporary, ruling that Alexis was to stay with Chad for this school year but that future custody was open to discussion: "[I]t is appropriate to modify the custody . . . so that Alexis stays with Mr. Paul for this school year. . . . The parties need to discuss the future with either a child development counselor [or] school counselors. . . ." When Sharon's counsel asked whether there could be a modification of

custody at the end of the year, the superior court responded: "Yeah, and I hope the parties can sort [it] out by agreement, but we'll do it by a motion, if not, . . . this is for one— for the next year or for the school year." And in response to whether the modification of custody switched the prior arrangement, the superior court responded, "Yes. But based upon the testimony, the parties were going to see how it went and then they'll reconsider what they're going to do." The parties agree that the superior court's modification of custody was to last only through the 2007–2008 school year, and during oral argument before this court, they noted the superior court's recent sua sponte appointment of a child custody investigator to re-evaluate custody at the end of this temporary period.

Sharon filed a motion for reconsideration on September 10, in which she raised a number of arguments, including (1) that there was no written agreement to change custody as the settlement agreement required; (2) that there had been no change in circumstances to support a modification; (3) that the settlement agreement should have been enforced; and (4) that a custody investigator should have been appointed. Three days later, the superior court denied the motion for reconsideration. Sharon appeals the custody modification in favor of Chad.

### III. STANDARD OF REVIEW

We review a trial court's child custody modification decision deferentially, reversing the decision only when the lower court abused its discretion or when its controlling findings of fact were clearly erroneous.[1] Abuse of discretion is established if the lower court "considered improper factors in making its custody determination, failed to consider statutorily mandated factors, or assigned disproportionate weight to particular factors while ignoring others."[2] We conclude that a finding of fact is clearly erroneous if, after reviewing the record as a whole, we are left with a definite and firm conviction that a mistake has been made.[3]

---

1. *Barrett v. Alguire,* 35 P.3d 1, 5 (Alaska 2001).

2. *Chesser–Witmer v. Chesser,* 117 P.3d 711, 715 (Alaska 2005).

3. *Barrett,* 35 P.3d at 5.

## IV. DISCUSSION

### A. The Superior Court Erred in Granting the Motion To Modify Custody Because There Had Been No Substantial Change in Circumstances.

■ Under AS 25.20.110(a), an award of custody "may be modified if the court determines a change in circumstances requires the modification ... and the modification is in the best interests of the child." The movant must prove a substantial change in circumstances as a threshold matter.[4] We require this showing to maintain continuity of care and to avoid disturbing and upsetting the child with repeated custody changes.[5] We have cautioned that "[c]hildren should not be shuttled back and forth between divorced parents unless there are important circumstances justifying such change."[6]

Here, the superior court concluded that the informal agreement between Chad and Sharon constituted a substantial change in circumstances and that modifying custody would serve Alexis's best interests. Sharon agrees that she and Chad had discussed and experimented with the possibility of changing their custody arrangement but she maintains that no agreement was ever finalized and that the experimental arrangement lasted no more than three weeks.[7] Therefore, she argues, the requisite substantial change in circumstances was not established.

In *Morino v. Swayman*, we recognized that "[c]ustodial parents should have the flexibility to experiment with new visitation schedules without fearing that every temporary change could be the basis for modifying visitation."[8] We concluded that a change lasting ten months could warrant a modification in visitation,[9] but expressly noted that "[o]f course, experimental changes lasting only a few months should not qualify as a change in circumstances."[10] We warned that "if temporary variations in visitation schedules always constituted a substantial change in circumstances, primary custodians would be discouraged from allowing any favorable deviation from the visitation order."[11] It is important to allow parents leeway to cooperate and experiment with custody. Characterizing a short-term temporary and informal custody arrangement as a substantial change in circumstances could "discourage parents from being generous with each other in custody matters and, to that extent, run[ ] counter to the goals of Alaska's family law and the needs of Alaska's children of divorce."[12]

■ In this case, it is undisputed that the informal arrangement lasted only approximately three weeks.[13] In *Morino*, we emphasized that "the change in circumstances required to modify visitation ... is not as great as that required for a change in custody."[14] Here, modification of primary physical custody is at issue, setting an even higher bar to prove a change in circumstances.

Chad concedes that the duration of the change "was not lengthy," but he claims the distinguishing factor is that "there was an actual agreement to modify custody" here. The record nonetheless indicates that the informal agreement was not only short-lived but experimental. As Chad testified, "we had discussed that we were going to have her go to school here for the year [in] Illinois, then we would readdress it next year to see how she was doing and we'd rediscuss custody next year also, see what was in her best interest." Sharon confirmed that Chad had agreed "several times that we would see how

---

4. *Morino v. Swayman*, 970 P.2d 426, 428 (Alaska 1999).

5. *S.N.E. v. R.L.B.*, 699 P.2d 875, 878 (Alaska 1985).

6. *Nichols v. Nichols*, 516 P.2d 732, 735 (Alaska 1973).

7. Under the settlement agreement, Alexis was to return to Alaska three weeks before school began.

8. 970 P.2d at 429.

9. *Id.* at 427, 429–30.

10. *Id.* at 429.

11. *Id.*

12. *Id.* at 433 (Fabe, J., dissenting).

13. *See supra* note 7.

14. 970 P.2d at 428.

it went; you know, we could see how it goes." And the superior court recognized that "the parties were going to see how it went and then they'll reconsider what they're going to do," which impacted its decision to grant a modification for this school year only and to leave future arrangements open for discussion. Because temporary, experimental arrangements do not constitute substantial changes in circumstances sufficient to warrant modifications of custody,[15] relying on the parties' informal, temporary agreement to establish a substantial change in circumstances was error.

■ Chad argues alternatively that "the actions taken by the parties and not the mere informal agreement were the basis of the substantial change in circumstances." And although its oral decision focused on the informal agreement, the superior court included other elements in its order denying reconsideration of its decision to modify custody:

> There had been a change in circumstances. Alexis had been integrated into her new family. She had been advised of the parents' joint decision that she should remain and go to school in Illinois. Her mother had sent her personal items and clothing to support and reflect that new arrangement. The parties set this train in motion, and to preserve her stability Alexis will reside with Chad and go to school in Illinois.

But none of these elements constitutes a substantial change in circumstances. First, Alexis was scheduled to spend the summer with Chad in Illinois under the existing agreement. Her integration into Chad's household was a natural consequence of visitation, not a substantial change in circumstances, and her return to Alaska at the end of the summer was anticipated by the custody arrangement, and did not amount to a disruption in her stability. Similarly, Alexis

had been in school for only two days before her mother requested her return and only one week by the time of the hearing. The superior court found in its oral decision that in light of this short duration, and in light of her young age, her starting the first grade in Illinois was not a compelling consideration. The superior court stated:

> The beginning of school is not an overwhelming consideration. This is first grade. . . . I mean, it wouldn't—I know that school is important . . . and being there with everybody else at the start might be important, but the first grade, I don't find that . . . even a week or two weeks or to start late, one or the other is compelling, but that is not—just because she started a week ago isn't going to be dispositive.

Next, the superior court cited the school clothing Sharon sent as evidence that the parties had an informal agreement, but as discussed above, an informal, experimental agreement with a duration of a few weeks is insufficient to warrant a custody modification under our case law.

■ Nor does Alexis's expectation that she would remain in Illinois warrant a modification of custody. To rule otherwise would allow non-custodial parents to manufacture a substantial change in circumstances merely by telling a child that she will remain with the non-custodial parent. Notably, the statute does not include consideration of the child's expectations in its best-interests analysis.[16] It does require consideration of the child's preferences,[17] but the record does not indicate that Alexis expressed a preference to stay in Illinois rather than return to Alaska. And even had she expressed such a preference, its persuasiveness would be limited in light of her age.[18] As one commentator

15. 970 P.2d at 429; *see also id.* at 430–31 (Fabe, J., dissenting).

16. *See* AS 25.24.150(c); AS 25.20.110.

17. AS 25.24.150(c)(3); AS 25.20.110. The superior court did not address Alexis's preference in its oral decision or its order on reconsideration. The superior court's silence on this factor suggests that it did not consider Alexis to be "of sufficient age and capacity to form a preference." AS 25.24.150(c)(3).

18. *See Veazey v. Veazey*, 560 P.2d 382, 386 (Alaska 1977), *superseded by statute on other grounds*, ch. 63, § 30, SLA 1977, *as recognized in Deivert v. Oseira*, 628 P.2d 575, 579 (Alaska 1981) (suggesting that a young child's preferences are often unreliable as she can be easily influenced by the behavior of her parents, but that a relatively mature teenager's reasoned preference carries more weight).

has remarked, involving young children in the process of deciding child custody matters is generally not appropriate because "they have neither the emotional and cognitive maturity, nor the capacity for moral reasoning, that is essential to participation in meaningful dialogue regarding their perspectives on divorce outcomes and parent behaviors."[19]

The superior court's finding that Chad had proven the requisite substantial change in circumstances to support a modification of custody was an abuse of discretion. Because we reverse the modification of custody for this reason, we need not reach Sharon's other arguments.[20]

## V. CONCLUSION

Because no substantial change in circumstances was demonstrated, we REVERSE the superior court's decision and VACATE the order modifying custody. Alexis shall spend summer 2008 with Sharon. The parties shall then revert to the original custody arrangement under which Sharon exercises school-year custody and Chad is permitted visitation as outlined in the parenting plan.

CARPENETI, Justice, dissenting, with whom WINFREE, Justice, joins in Part IV(C).

CARPENETI, Justice, dissenting, with whom WINFREE, Justice, joins in Part IV(C).

## I. INTRODUCTION

During the summer of 2007 Sharon McLane unequivocally agreed with Chad Paul to reverse the custody arrangement for their daughter Alexis that Sharon and Paul had put into place the previous year. The parties agreed that instead of returning to Sharon in Fairbanks, Alexis should stay with Chad in Illinois and attend school there. In recognition of this agreement—which was expressed both orally and in writing—Sharon wrote eloquently (if earthily) of the pain it caused her, sent Alexis's clothes to Chad, prepaid child support to Chad covering a period of five months, and notified the Child Support Services Division that it should stop collecting child support from Chad. Alexis was notified of the change, as she had to be, given that she was not returning to Alaska at the scheduled time but indeed began school in Illinois. Three days after Alexis began school in Illinois, Sharon changed her mind. Because I cannot agree that the superior court in Fairbanks abused its discretion in deciding that there had been a substantial change in circumstances, I dissent.

## II. FACTS AND PROCEEDINGS

Sharon McLane and Chad Paul married in 1999. Their union produced Alexis Rose Paul, who was born in 2000. In 2006 the parties divorced. They agreed in a parenting plan that was attached to their settlement agreement that they would share legal custody of Alexis, that Sharon would have primary physical custody of Alexis, and that Chad would have summer visitation from one week after the end of school to three weeks before the beginning of school. Alexis's visitation with Chad during the school year would depend upon his residence.[1]

About the time of the divorce, Chad moved from Alaska to Illinois. In early 2007 Chad married a woman with two young children of her own. Pursuant to the parties' agreement, Sharon sent Alexis to Illinois for her summer visitation with Chad in May 2007.

**19.** Joan B. Kelly, *Psychological and Legal Interventions for Parents and Children in Custody and Access Disputes: Current Research and Practice,* 10 Va. J. Soc Pol'y & L. 129, 151 (2002).

**20.** We do note, however, that the superior court appears to have had little information regarding Alexis's best interests beyond the testimony of Sharon and Chad. The superior court may have felt that it had sufficient information to grant a temporary, one-year modification of custody, but as we have explained, such modifications should be granted only rarely. *Chesser v. Chesser-Wit-* mer, 178 P.3d 1154, 1157 n. 10 (Alaska 2008) ("Generally, custody orders are considered final and permanent.... While a temporary order may have been appropriate under the unusual circumstances of this case, such instances should be rare.").

**1.** If Chad remained in the same community as Sharon, he would have visitation every weekend from Friday evening to Sunday at 4:00 PM. If he lived in a different community, he would have reasonable visitation as could be arranged.

During the next month, Chad and Sharon began discussing, through e-mails, the possibility of changing Alexis's primary physical custody from Sharon to Chad. Over the course of several weeks, Sharon and Chad considered the pros and cons of changing their custody arrangement. Sharon exhibited a remarkable ability to analyze the strengths and weaknesses of each parent and to consider what was best for Alexis. For example, even while noting, in a June 14 e-mail to Chad, that "[y]ou and I have zero trust for each other," she was able to recognize Chad's strengths: "Alexis loves you. I never said you weren't a good dad. I do think her leaving this town may be for the best." But she also saw reasons not to change: "I do think she needs more time with you. I just don't know if she won't think I've abandoned her too." On July 10 Chad inquired of Sharon: "We also need to make a final decision on what we are going to do with Lexy. If I am going to have to register her for school here it needs to be soon. . . . Let me know what you think so that if she is staying we can get the paperwork done." In response, Sharon asked Chad, "Have you had a chance to see what Alexis thinks? I realize she cannot make the decision, but as you said—she can either make it work or not."

During the following two weeks, Sharon agreed to the custody change. On July 23 the parties exchanged a series of e-mails concerning the paperwork to effect the change. On July 24 Sharon corrected a number of typographical errors in the paperwork and requested that her summer visitation extend until two weeks, not three weeks, before school started. In response to Chad's question, Sharon asked that he e-mail the final version of the paperwork.

Beyond merely writing her assent, Sharon took unusually concrete steps to verify her agreement that Alexis spend the upcoming school year with Chad. On July 29 she notified Chad that she had ordered clothes for Alexis for school that were being sent to her. As she stated, "I got Lexy lots of stuff. I feel guilty and unbelievably lonely without her plus not being there for her—I'm sure the shrink will call it guilt buying." But even more than sending school clothes to her daughter, Sharon also notified Chad that she was sending him five months of child support in advance and additional money for school registration and school supplies: "I sent [$]2000.00 which is five months child support and extra for the registration and some school supplies." She in fact sent the money. She notified the child support agency to stop collecting from Chad.

Finally, at the end of a string of e-mails on July 30 discussing details of visitation for upcoming school breaks, Sharon wrote of the difficulty she was experiencing as a result of having agreed to the custody change: "Well, all I can say is that[,] if this is what you went through missing her[,] it sucks. . . . Completely and totally sucks the big one. But this is the right thing to do—I just don't have to like it. Go ahead and mail the packet off. I'll sign it and we'll be done."

The parties proceeded to implement their agreement. Chad mailed the revised agreement to Sharon that she had agreed to and said she would sign. Sharon having sent school clothes and money for school registration, as well as five months of child support in advance, Chad registered Alexis in school in Illinois. Alexis began school on schedule on August 21.

Shortly after Alexis began school, Sharon changed her mind. She notified Chad on August 23 that she wanted him to send Alexis back to Alaska. Chad, believing that the parties had agreed to modify Alexis's custody so that she would attend that school year in Illinois, declined to withdraw Alexis from school and send her to Fairbanks. The parties cooperated in setting the matter on for an expedited hearing in the superior court in Fairbanks on August 29.

Superior Court Judge Randy Olsen conducted the hearing. Sharon testified in person; Chad appeared and testified telephonically. At the end of the hearing, the court found that there was an agreement that Alexis was to stay in Illinois for the school year: "I am convinced—I am absolutely convinced that there was an agreement that she was to stay for the school year." Treating this agreement as a material change in circumstances, the court went on to consider

whether a change in custody would be in Alexis's best interests. After engaging in further colloquy with both the parties and their counsel, Judge Olsen decided that she should remain in Illinois for the school year:

> I believe and I find that a decision was made for Alexis to stay and that Sharon thought differently and changed her mind late. Now, that's usually what a writing is for. It's so that people actually have a written signature that helps them realize, this is the point of no return. This is the decision point. That's one reason to have a written agreement before a person is actually bound to an agreement.

> In this case, though, I believe that the point of no[ ] return[ ]—the decision point was reached earlier and that was when Alexis was not returned[,] when school clothes were sent, money was sent, and that the decision was made.

At the end of the hearing Judge Olsen clarified that his order changing primary physical custody to Chad would last for the current school year only. He encouraged the parties to attempt to reach agreement for the time after that but noted that custody would again be resolved by motion in the event that the parties could not reach agreement.

Sharon appeals.

## III. STANDARD OF REVIEW

"The trial court has broad discretion in determining child custody issues; resolution of those issues will be reversed 'only if, after a review of the entire record, we are convinced that the trial court abused its discretion or that the controlling factual findings made by the trial court are clearly erroneous.' " [2] An abuse of discretion may be found only where the trial court "considered improper factors in making its custody determination, failed to consider statutorily mandated factors, or assigned disproportionate weight to particular factors while ignoring others." [3] A factual finding is clearly erroneous only if, after viewing the record as a whole, we are left with a definite and firm conviction that a mistake has been made.[4]

## IV. DISCUSSION

### A. The Superior Court Did Not Clearly Err in Finding that Sharon Had Agreed To the Custody Change.

Judge Olsen's factual finding that Sharon had agreed to the change of custody is unassailable. Apart from and beyond Chad's testimony that Sharon had agreed, her e-mail statements lead ineluctably to that conclusion and her actions confirm it.

As to her e-mails, she went from honest consideration of the proposal, to discussion of the specifics, to confirming that Alexis had been consulted about the change, to final acceptance. Her anguished e-mail of July 30, in which she describes the pain of missing her child, leaves no doubt that she had made her decision and that, though painful, it was right: "Well, all I can say is that[,] if this is what you went through missing her[,] it sucks. . . . But this is the right thing to do— I just don't have to like it. Go ahead and mail the packet off. I'll sign it and we'll be done."

But even beyond Sharon's words, her actions speak volumes. She bought school clothes for Alexis and sent them to her in Illinois. She sent money to Chad specifically for Alexis's school registration in Illinois. She sent five months of child support payments to Chad in advance. She had inquired to make sure that Alexis's input had been obtained before the decision was made, and so she knew that Alexis had been informed of the change in plans for the upcoming year. She allowed Alexis to start school in Illinois pursuant to the agreement to change custody for the year. In light of these facts, it cannot be said that Judge Olsen's factual finding that Sharon had agreed to the change in custody is clearly erroneous. And, indeed, today's opinion does not do so.

---

**2.** *Barrett v. Alguire*, 35 P.3d 1, 5 (Alaska 2001) (citation omitted).

**3.** *Chesser–Witmer v. Chesser*, 117 P.3d 711, 715 (Alaska 2005).

**4.** *Barrett*, 35 P.3d at 5.

### B. The Superior Court Did Not Abuse Its Broad Discretion in Considering Whether To Change Custody Because There Had Been a Substantial Change in Circumstances: The Parties Had Agreed To Change Alexis's Custody, They Had Taken Substantial Steps To Implement That Agreement, and Alexis Was Aware of the Change.

Today's opinion rests on two formalities that, under the facts of this case, are inconsequential: (1) Although Sharon had undeniably agreed to the custody change, had taken substantial steps to implement it, had made sure that Alexis was aware of it, and knew that it was being implemented, Sharon had not signed the formal agreement changing custody; and (2) although the agreement covered a one-year period, it had been in effect for less than a month when Sharon changed her mind. Given the practical realities of planning for and implementing a change in custody for a school-age child between households located thousands of miles apart, and given the realities of the situation facing Judge Olsen when the expedited case was brought to him in the second week of an ongoing school year, these formalities should not be enough upon which to base a finding of abuse of discretion.

That Sharon had not signed the agreement should not be dispositive. She had unequivocally stated her intention to sign it ("[T]his is the right thing to do—I just don't have to like it. Go ahead and mail the packet off. I'll sign it and we'll be done."). Just as importantly, the lack of her signature is immaterial in contract terms. As the Restatement of Contracts makes clear, a party can manifest assent by performance as well as by signing a contract: "the offeree may choose to accept either by promising or by rendering the requested performance." [5] Judge Olsen correctly looked to Sharon's remarkable performance—buying and sending school clothes to Alexis in Illinois, sending money to pay for her school registration in Illinois, prepaying five months of child support to Chad, letting Alexis begin school in Illinois, etc.—in concluding that the parties had passed the point of no return by their actions and that the lack of Sharon's signature should not be dispositive.

The court relies on general language in *Morino v. Swayman*[6] as support for its conclusion that the superior court erred in finding that Sharon's agreement that Alexis remain in Illinois for the school year was not a substantial change in circumstances. But *Morino* is entirely distinguishable. First, *Morino* held that a superior court that had *refused* to hold an evidentiary hearing on changed circumstances had erred;[7] consequently, its statements as to what level of change might be insufficient to trigger a hearing are necessarily dicta. Second, and more importantly, *Morino* dealt with a minor change in a weekly visitation pattern between two parents who lived in the same city.[8] Because the changed regime had been in effect for ten months, we held that the superior court should have held a hearing to determine whether it constituted a substantial change that could justify a change in the custodial order.[9] It simply makes no sense to equate this "minor visitation change"[10] that merely adjusted the hours of weekly visitation between parents living in the same city with the decision to change the child's state of residence for an entire school year that we have in the present case.

In characterizing the change as lasting "only approximately three weeks,"[11] the court misses the significance of the change in Alexis's life and expectations that taking her

---

5. RESTATEMENT (SECOND) OF CONTRACTS, § 50 cmt. a.

6. 970 P.2d 426 (Alaska 1999).

7. *Id.* at 427.

8. The non-custodial parent was entitled to midweek visitation of three hours with the children as well as weekends. The custodial parent had agreed to moving that visit by one day and turning it into an overnight and combining it with weekend visitation, leaving the same amount of actual visitation but requiring less disruption of the children's schedules. *Id.*

9. *Id.* at 429.

10. *Id.* at 430 (Fabe, J., dissenting).

11. Op. at 1043.

out of a school that she had already started would have entailed, an impact that Judge Olsen did not fail to appreciate. While it is true that Alexis had been in school for only a week when the matter came before him, and while it is true that Judge Olsen realized that a week of school for a first grader was not "an overwhelming consideration" or "dispositive," it remains that Alexis had been told for several weeks that she would be remaining in Illinois for the year, had prepared for the change, and had begun to attend her new school. For Alexis, the decision of her parents to change her custody for the upcoming year was significant, and its significance could not have been lost upon the child. It surely was not lost upon Judge Olsen:

> There had been a change in circumstances. Alexis had been integrated into her new family. She had been advised of the parents' joint decision that she should remain and go to school in Illinois. Her mother had sent her personal items and clothing to support and reflect that new arrangement. *The parties set this train in motion,* and to preserve her stability Alexis will reside with Chad and go to school in Illinois.

(Emphasis added.)

It is true, as today's opinion notes, that in *Morino* we encouraged custodial parents to experiment with ongoing custody arrangements—in an effort to find what works best for children—without fearing that "every temporary change could be the basis for modifying visitation."[12] But the change in this case was not a temporary change as *Morino* used that term. As Judge Olsen found, this change was set for the period of the school year. It was intended by Sharon and Chad to last for a substantial period, as Sharon's act of sending five months child support to Chad in advance clearly demonstrates. Finally, in a case like this, where a major change that involves substantial pre-change planning and execution are involved,

there must come a time when the train that the parties "set ... in motion," as Judge Olsen termed it, leaves the station. It does not chill parents' right to experiment with ongoing custody arrangements to hold that at some point they are bound, by their promises and their actions, to proceed.

The court downplays the significance of Alexis's integration into her new family by noting that it was the natural result of her having spent the summer in Illinois under the existing agreement.[13] But that integration must have been qualitatively different after a month of expectation that she would be remaining with her new step-brother and step-sister not for one more week[14] but for the entire upcoming year. The court downplays the significance of the stability achieved by Judge Olsen's order, relying on the existing order: "her return to Alaska at the end of the summer was anticipated by the custody arrangement, and did not amount to a disruption in her stability."[15] This observation completely ignores the effect on a six-year-old child of her parents preparing her for a month for a major change in her life, substantially implementing that change, and then abruptly cancelling the program. Of course taking her out of school and sending her back to Alaska in late August 2007 would have amounted to "a disruption in her stability"!

The court similarly errs in its treatment of Alexis's expectations, placing the blame on Chad for notifying Alexis of the agreed-upon change: "Nor does Alexis's expectation that she would remain in Illinois warrant a modification of custody. To rule otherwise would allow non-custodial parents to manufacture a substantial change in circumstances merely by telling a child that she will remain with the non-custodial parent."[16] The truism that non-custodial parents should not be allowed to "manufacture" a substantial change in circumstances has nothing to do with this case. First, *Sharon* raised the necessity of discuss-

---

12.  Op. at 1043.

13.  Op. at 1044.

14.  The parties' prior agreement called for Alexis to be returned to Fairbanks three weeks before the start of her school.

15.  Op. at 1044.

16.  Op. at 1044.

ing the planned change with Alexis, properly noting that while Alexis should not make the decision she should be consulted about it. Second, Sharon's actions in sending clothes to Illinois for Alexis could only reinforce whatever Alexis had been told by Chad. Third, how could Alexis *not* have been notified that her parents had agreed that she should remain in Illinois? She was going to remain there and go to school there. She did go to school there. There is no basis for the suggestion that Chad should not have notified Alexis that her parents had decided that she would remain in Illinois for the school year. And there is therefore no way to avoid the necessity of considering Alexis's expectations.

Equally unavailing is the court's suggestion that the parents here, and especially Chad, "involv[ed] young children in the process of deciding child custody matters." [17] Of course it is a truism that young children should not be involved in the decision process. But that did not happen here. What happened is that, during the parents' decision-making process, Sharon checked with Chad to find out "what Alexis thinks." Sharon even quickly noted that it was not Alexis's decision, but that she ought to be heard on the matter. What happened further is that, after the parents made the decision, Alexis was informed of it, as she necessarily had to be. What is really at stake in this matter is the propriety of both parents telling their child one thing and then doing another.

Judge Olsen was presented by both parents with a Hobson's choice in late August 2007 when the matter came before him. He correctly found that the parents had agreed to change Alexis's custody to Chad so that she would remain in Illinois for the upcoming school year. He correctly found that they had not only agreed on that course of action, but had taken several substantial steps to implement it. He correctly found that, as a result of her parents' actions, Alexis had the expectation that she would remain in Illinois for the school year. On the basis of these factual findings, I would conclude that Judge Olsen did not abuse his discretion in holding that a substantial change in circumstances had occurred. It was therefore proper for the court to consider whether it was in Alexis's best interests to change her custody for the upcoming school year.[18]

**C. Alternatively, the Order Having Been Temporary and the 2007–2008 School Year Having Passed, the Question Whether There Was a Substantial Change in Circumstances Justifying the Custody Change for That Year Is Moot.**

Judge Olsen's order was to be in effect for the 2007–2008 school year. That school year is now over. Both counsel at oral argument agreed that Judge Olsen's order was "temporary." Counsel for Chad agreed that by Summer 2008 all issues raised in this appeal would be moot. Given that the order was temporary, primary physical custody has now reverted to Sharon.[19] Should Chad desire to regain primary physical custody of Alexis, he will have to show a substantial change in circumstances.[20] While I conclude above that Judge Olsen did not err in reaching the best interests question, his decision to do so is now moot.

Because I believe that Judge Olsen did not clearly err in finding that a substantial change in circumstances had occurred, I believe that he correctly proceeded to consider Alexis's best interests.

**17.** Op. at 1045.

**18.** When faced with a motion to modify custody, a superior court must first determine whether a substantial change in circumstances has occurred that might justify a change in custody. AS 25.20.110(a). *Long v. Long,* 816 P.2d 145, 150 (Alaska 1991). Only if the court finds such a change does it go on to consider whether the requested change in custody is in the child's best interests. *Id.* Today's opinion holds that no such change in circumstances had occurred, (Op. at 1045) and the court therefore does not reach the question whether the requested change of custody was in the best interests of the child.

**19.** *See Chesser v. Chesser–Witmer,* 178 P.3d 1154, 1157 (Alaska 2008) (holding that temporary, one-year change in custody during school year was not final custody order modifiable only upon former custodial parent showing new change in circumstances).

**20.** *See Long,* 816 P.2d at 150.

## V. CONCLUSION

Because Alexis's parents had agreed that she should remain in Illinois to attend school for the year, because they had taken very substantial steps to put that plan into operation (including Sharon sending clothes to Alexis for school, sending money to Chad for school costs, and prepaying child support for five months), and because Alexis was aware of this major change in her life and had begun to attend school in Illinois, the superior court did not abuse its discretion in determining that there had been a substantial change in circumstances and considering whether a custody modification would be in Alexis's best interests. Alternatively, because the court's custody change order was temporary and the period of its operation has ended, the case is moot. For these reasons, I dissent from today's opinion.