NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| FRANCESCA S., f/k/a FRANCESCA K., | ) | |
| | ) | Supreme Court No. S-17527 |
| Appellant, | ) | |
| | ) | Superior Court No. 3DI-16-00105 CI |
| v. | ) | |
| | ) | MEMORANDUM OPINION |
| SHAWN K., | ) | AND JUDGMENT* |
| | ) | |
| Appellee. | ) | No. 1846 – September 8, 2021 |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Dillingham, Christina Reigh, Judge.

Appearances: Deborah Burlinski, Burlinski Law Office, LLC, Palmer, for Appellant. No appearance by Appellee.

Before: Bolger, Chief Justice, Winfree, Maassen, Carney, and Borghesan, Justices.

## I. INTRODUCTION

A woman appeals the superior court's order granting her ex-husband primary custody of their children. She also argues that the court's property division, child support determination, and denial of her motion to modify custody are erroneous. Because the superior court did not abuse its discretion or clearly err, we affirm its custody and property division orders.

---

\* Entered under Alaska Appellate Rule 214.

## II.  FACTS AND PROCEEDINGS

Francesca S. and Shawn K. married in February 2002 and have two minor children, Shannon and Nicole.[1]  In April 2016 Francesca filed for divorce, requesting shared physical and joint legal custody of the children, an adjudication of "property rights and debts," and child support.  Shawn filed an answer requesting "primary physical custody" of the children "with reasonable visitation to" Francesca.  The superior court held a trial in April 2019.

### A.  Initial Hearing

#### 1.  Custody

Francesca asserted that she was the children's primary caregiver until she left the family home in Togiak to attend law school in 2016.  But she also acknowledged that there had been times when the family had not lived together.  One was when Shawn attended classes at the Alaska Vocational Technical Center (AVTEC) after Shannon was born in 2005 and she took care of Shannon.  But she also testified that Shannon went to AVTEC to "live with [Shawn]."  And she admitted that while she attended the University of Alaska Fairbanks, Shannon sometimes lived with her and sometimes with Shawn in Togiak.

Francesca also testified that she always encouraged the children to call Shawn and maintain a relationship with him.  She claimed that Shawn did not reciprocate.  She blamed his fiancée, Darian, for making him "hostile" to Francesca's attempts to set up regular phone contact with the children while she was in law school.

Francesca testified that she was currently looking for jobs in Anchorage and that Shannon had said she wanted to live with Francesca.  Francesca also said she had found a high school for Shannon in Anchorage.

---

[1]     We use initials and pseudonyms to protect the family's privacy.

Francesca asserted that she would provide a more stable environment for the children in Anchorage than Shawn could in Togiak. She stated that she had concerns about Shannon walking around at night unsupervised and that Shannon had been "caught smoking marijuana." But she testified that if she could not find a job in Anchorage, she planned to return to Togiak to fish with her parents.

Francesca acknowledged that she did not like Darian, who she claimed used "vulgar language" in texts to her and called the children "brats." And she testified that Shawn would not agree to talk to her about Darian. Finally, Francesca testified that Shawn was wrong when he claimed she had an alcohol problem.

Shawn testified that he had been the children's primary caretaker "since the beginning." He stated that he had cared for Shannon as a baby while he was at AVTEC and that Francesca had stayed in Togiak to work.

He disagreed that Francesca should have custody, explaining that he "know[s] what she's like behind closed doors." And he testified that neither he nor Darian had tried to prevent the children from having a relationship with, or contacting, Francesca.

Shawn testified that he was particularly concerned about Shannon, who was "afraid to get on the plane" for her most recent visit to Francesca. He testified that he "got the impression" that Francesca had been intoxicated during the previous visit, and that Shannon felt both that the divorce was "her fault" and that Francesca favored Shannon's sister. He asked the court to order "some kind of evaluation" if it was planning to award custody to Francesca. He also testified that he planned to remain in Togiak, where he "provide[s] for the children pretty well."

## 2. Property

Francesca and Shawn disagreed about whether certain property was marital and how it should be allocated. Their disagreement centered on a commercial fishing

permit that Shawn owned when they married, the home they lived in (the "green house"), and a piece of property where they had started building a bigger home ("Lot 5, Block 5").

Francesca argued that even though Shawn's grandfather had transferred the fishing permit to him before they married, it had become marital property because she "fished with him and . . . gave up [her] summers and didn't get paid"; the proceeds from fishing "all went into the joint account" to "pay for bills"; and they had listed the permit as collateral on a loan application to buy a new fishing vessel. She characterized her role as "pretty much a crew member," explaining that she "helped maintain and manage the fishing business."

Francesca testified that when they got married Shawn told her "his grandpa gave us th[e green] house." She stated that during their marriage they made additions that doubled the size of the "one room little cabin." Francesca estimated the green house's value at "about $50,000," and argued that it should be awarded to Shawn.

Francesca also testified that Lot 5, Block 5 was a piece of property she paid for during the marriage to build a house on and that Shawn's name was not on the deed for the property. She stated that she had worked with Shawn to build a house on the property, and estimated that the value of the property was $70,000 after the improvements they had made. Because she "eventually" wanted to move back to Togiak, she asked the court to award it to her.

In response to Francesca's claims, Shawn testified that his grandfather transferred the fishing permit to him before he and Francesca married. And he acknowledged paying Francesca "as a crew member."

Shawn asserted that the green house was not marital property. He testified that it "doesn't belong to me" and it "never belonged to me." He stated that his grandfather had "willed it to my mother." His mother later testified that Shawn's

grandfather willed the house to her and her sister and that the will stated "any of his grandchildren [could use it] if they need to."

Shawn urged the court to award Lot 5, Block 5 to him instead of Francesca. He argued that it was marital property because it was "bought with marital money [and w]e just decided to put the land under her name at the time." Although he agreed with Francesca that it was worth $70,000, he stated that he had "done almost all of the work to build [the] house," approximately "95 . . . 98 percent of the work." And he estimated that "we might have [$]25 or 30,000 into it and my labor." He asked that the court order the property to "stay with me," especially since he was "building it" for "the children to have a bigger house."

Following their testimony the court ordered that a child custody investigator interview Shannon. The court refrained from issuing any additional orders until after Shannon had been interviewed.

## B.    Continued Custody Hearing

The custody investigator interviewed Shannon in May 2019. She reported that Shannon told her Francesca drank "maybe every other day" during her last visit. She said Shannon stated that when her mother was drunk she told her she would never be successful and that Shannon overheard Francesca say she liked her sister Nicole better than Shannon. Shannon also told the investigator that Francesca said it "is a bad thing" that Shannon looks like her father. When asked about her father and Darian, Shannon told the investigator she had a close relationship with Darian because she "can tell Darian anything and Darian will help [me]." Shannon also "want[ed] the judge to know that she wants to live with [Shawn]."

The custody hearing resumed the following week. Francesca urged the court to disregard the custody investigator's report, arguing that Shannon had been coached. She denied the allegations about her drinking and accused Shawn and Darian

of painting a negative picture of her to the children. Shawn denied coaching Shannon. Darian testified that she and Shannon were "extremely close" and that she tried "to nurture all of [her and Shawn's children] equally and in the best way [she could]."

### C. Custody And Property Division Order

The court issued its custody and property division order in June 2019. After considering each of the best interest factors in AS 25.24.150(c),[2] the court determined that it was in the children's best interest to award Shawn primary physical custody and Francesca visitation. Francesca received liberal visitation, with the children spending summers, spring breaks, and at least half of their Christmas vacations with her.

Turning to the property division, the court found that the green house was "not marital property because Shawn is not the owner of the home." The court acknowledged that Francesca contributed to the renovation of the house, valued the marital contributions to the home at $10,000, and awarded Francesca $5,000.

The court next found that Lot 5, Block 5 was marital property and awarded it to Shawn. The court based its decision on the evidence that Shawn had been working on the home to "accommodat[e] their growing family" and because he was "the parent with primary physical custody."[3] The court rejected the parties' $70,000 valuation,

---

[2] The statute requires the court to consider: (1) the child's physical, emotional, mental, religious, and social needs; (2) each parent's ability and desire to meet those needs; (3) the child's preference; (4) the love and affection existing between the child and each parent; (5) the length of time the child has lived in a stable and satisfactory environment; (6) each parent's willingness and ability to facilitate and encourage a close and continuing relationship between the other parent and the child; (7) any evidence of domestic violence, child abuse, or child neglect in the household; (8) any evidence that substance abuse by either parent or household members affecting the child's physical or emotional well-being; and (9) any other pertinent factors.

[3] *See* AS 25.24.160(a)(4)(F) (courts may consider desirability of awarding
(continued...)

finding that "[t]he actual financial contributions the marriage made to the property is [sic] closer to $30,000" and therefore "[t]he property and the unfinished home . . . shall be valued at $50,000."

Finally the court found that the commercial fishing permit was Shawn's separate property that had not transmuted to marital property. The court found that Shawn's grandfather had transferred the permit to him before he and Francesca married. Because Francesca had presented no evidence that the permit had transmuted, the court found that it had not. It recognized Francesca's contributions to the fishing operation but determined that her work as a crew member was not evidence of Shawn's intent to donate his permit to the marital estate.

### D. Motion To Modify

Three months later, a day before a scheduled visit with Shawn, Francesca filed a petition for a domestic violence protection order (DVPO) on the girls' behalf against Darian. A standing master granted the ex parte order. Shortly thereafter Francesca moved to modify custody, alleging that Darian had physically and verbally abused the children. She attached to her motion copies of the petition and order as well as notes from a counselor who had recently seen Shannon. The notes indicated that Shannon reported using marijuana with Darian and that Darian provided her with alcohol. Francesca also made a report to the Office of Children's Services (OCS), which interviewed the girls.

### E. Custody Modification Hearing

The court scheduled an evidentiary hearing a few weeks later on Francesca's motion and her petition for a long-term DVPO against Darian. Francesca

---

[3] (...continued)
family home to party with primary physical custody of children when dividing marital estate).

called the OCS worker who had interviewed Shannon and Nicole. The OCS worker testified that she had interviewed the girls after a report that alleged they were being neglected and physically abused and that Darian was supplying Shannon with drugs. She testified that the report also claimed that Shawn was aware Darian was supplying drugs to Shannon and that he had called Shannon a liar. The OCS worker identified Francesca as the reporter but said that based on her interviews with them, she did not think that either girl had been coached. The worker did not remember whether police had been involved, but testified that if she thought a crime had been committed she would have reported it to law enforcement.

Francesca next presented the counselor who had met with her and Shannon. The counselor testified that they both reported Darian had given Shannon marijuana and alcohol, that Darian drove while intoxicated with Shannon, and that Darian threatened Shannon with violence. The counselor testified that Shannon said she did not want to live with Shawn and that Shawn loved Darian more than her and her sister. The counselor also indicated that she "couldn't say" whether Shannon had been coached.

Francesca testified last. On cross-examination she conceded that the allegations of physical abuse were "from before the Court's most recent custody order." She also conceded that she made three phone calls to Shannon before Shannon spoke with the OCS worker, but she denied coaching Shannon.

At the conclusion of the hearing, the court granted Francesca's request for another custody investigator interview with Shannon and also with Nicole. The court specifically ordered the investigator to interview the girls regarding any domestic violence or substance abuse in either Shawn's or Francesca's home.

The custody investigator submitted her report on November 14, 2019. Shannon told the investigator that Darian sometimes smoked marijuana and drank alcohol with her and other children, that she gave them drugs, and that Darian drank

"once" with her. Shannon told the investigator that although this was happening during her previous interview, Darian had told her not to say anything and she did not want to get Darian in trouble. Shannon also reported that Darian "push[ed]" her and her sister when she was angry, and that when she told Shawn about Darian, he did not believe her.

Shannon told the investigator that she "exaggerated a lot" in her first interview about Francesca's drinking. She told the investigator that she had "messed everything up because of the things I was lying about then. I don't know what to do." The investigator noted that Shannon appeared to be "placed squarely in the middle of her parents' conflict." During her first interview she believed that Shawn wanted her to live with him and Darian, "so she did her best to" make that happen. In the second interview she stated that she was "doing her best to get to be with [Francesca]," because Francesca "really want[ed her]." She told the investigator, "No matter what I do, I'm doing something wrong."

The investigator also interviewed Nicole, who said that Darian was "not very nice" and sometimes pushed her. Nicole also said that she wanted Shawn to move to Anchorage so she "could see each parent every other day." The investigator noted that Nicole had not provided much information, "likely due to her young age and immaturity."

The hearing resumed in November. At the start of the hearing, the court admitted videos and notes from the children's OCS interviews. In her interview with OCS, Shannon reiterated that Darian "shove[d]" her, threatened to hit her, and called her names. The interview notes reported that Shannon claimed she had smoked marijuana with Darian "more than 15 times" and had drunk with her "once or twice." According to the interview notes, Shannon did not think Shawn would believe her if she told him about Darian's behavior and Shannon now wanted to live with Francesca in Anchorage.

The OCS notes stated that Nicole did not report any substance abuse or physical abuse, but reported that Shawn and Darian yelled at each other. Nicole reported that she felt scared when Darian "looks at me the way she looks at [Shannon]." And she told the interviewer she felt safe with her father and her mother, but not with Darian.

Francesca again testified. She denied coaching the girls before any interviews. Francesca then called Darian as a witness.

Francesca questioned Darian about her recent assault conviction and the girls' statements to the custody investigator about how Darian treated them. Darian acknowledged her assault conviction, but denied that the girls' allegations were true. She accused Francesca of coaching Shannon before the OCS and second custody investigator interviews.

Shawn called several witnesses after Francesca rested. His sister testified about overhearing and taking video of Shannon on the phone with Francesca before Shannon's 2019 interview with OCS. She testified that she thought Shannon's behavior was "suspicious" and feared that Francesca was trying to influence what Shannon said in her interviews. Shawn also recalled Darian, who again denied all of Francesca's allegations against her.

Finally Shawn testified. He testified that he believed Francesca wanted to modify custody so that she did not have to pay child support. He accused Francesca of coaching Shannon. He stated that Shannon was "very uncomfortable" and "not . . . able to speak freely" on the phone with her mother. He also testified that Shannon "was crushed" when Francesca chose to have a visit only with her sister. He stated that Darian did not condone or support Shannon smoking marijuana.

The hearing ended with Francesca offering rebuttal testimony. She again denied coaching Shannon before her OCS interview and asserted that she had told Shannon to "be brave and just tell the truth." She also stated that she had never told

Shannon to make up lies about Shawn and Darian. She testified that Shawn and Darian were "watching [Shannon] like a hawk" and that Shannon "indicated that . . . she's uncomfortable talking freely . . . around the house." On cross-examination she said she had not previously been aware that Shannon "felt rejected by [her] behavior."

### F. Order Denying Modification

The court denied the motion to modify in a December order.[4] The court found that Francesca had not met her burden of proving a substantial change in circumstances. The court "d[id] not find [Shannon's] disclosures credible." It described Shannon's contradictory interviews, noting that she was "caught between her parents" and "desperately want[ed] to appease each parent." The court observed that what Shannon reported in interviews "correlates with the parent with whom she is residing at the time of the interview," and concluded that Shannon's "willingness to stretch the truth to appease her parents" made her reports "unbelievable" and not "credible."

The court then turned to the allegations about domestic violence. The court noted that the lack of a "referral to law enforcement" after the girls were interviewed by OCS "support[ed] the finding that no crime of domestic violence occurred." The court explained that it was required to "limit its review of any change of circumstances to evidence that occurred after the most recent custody order."[5] Because Francesca conceded that the allegations about Darian were "based on conduct that preceded the custody trial," they could not amount to a change in circumstances. The court therefore denied the motion to modify custody.

---

[4] The court also denied Francesca's petition for a long-term protective order.

[5] *But cf. McAlpine v. Pacarro*, 262 P.3d 662, 626 (Alaska 2011) (noting that changed circumstances requirement is relaxed in custody matters involving domestic violence). Because the superior court determined that there was no crime of domestic violence, it did not relax the standard.

Francesca appeals the initial custody order, the property division, the child custody support calculation, and the court's denial of her motion to modify custody.[6]

## III.   STANDARD OF REVIEW

"The trial court has broad discretion in child custody decisions."[7] "We will reverse the superior court's [initial custody] decision when 'the record shows an abuse of discretion or if controlling factual findings are clearly erroneous.' "[8] We similarly review "a trial court's child custody modification decision deferentially, reversing the decision only when the lower court abused its discretion or when its controlling findings of fact were clearly erroneous."[9]

"Trial courts have broad latitude in making marital property divisions."[10] We "generally will not reevaluate the merits of the property division."[11] When we do review factual findings, "we ordinarily will not overturn a trial court's finding based on

---

[6]     Francesca asserts that the current child support calculation is incorrect, but it does not appear that she has raised the issue with the superior court. "[A]n issue that was not raised in the [superior] court will not be considered on appeal." *Pierce v. Pierce*, 949 P.2d 498, 500 (Alaska 1997). Because AS 25.25.205(a) grants a superior court "continuing, exclusive jurisdiction to modify its child support order," Francesca may choose to raise her child support argument with the superior court.

[7]     *Sweeney v. Organ*, 371 P.3d 609, 612 (Alaska 2016) (quoting *Veselsky v. Veselsky*, 113 P.3d 629, 632 (Alaska 2005)).

[8]     *Id.* (quoting *J.F.E. v. J.A.S.*, 930 P.2d 409, 411 (Alaska 1996)).

[9]     *Moore v. McGillis*, 408 P.3d 1196, 1200 (Alaska 2018) (quoting *Collier v. Harris*, 377 P.3d 15, 20 (Alaska 2016)).

[10]     *Bussell v. Bussell*, 623 P.2d 1221, 1222 (Alaska 1981) (quoting *Schoning v. Schoning*, 550 P.2d 373, 374 (Alaska 1976); *Burrell v. Burrell*, 537 P.2d 1, 4 (Alaska 1975)).

[11]     *Dundas v. Dundas*, 362 P.3d 468, 477 (Alaska 2015) (quoting *Stanhope v. Stanhope*, 306 P.3d 1282, 1289 (Alaska 2013)).

conflicting evidence, and we will not re-weigh evidence when the record provides clear support for the trial court's ruling" because "it is the function of the trial court, not of this court, to judge witnesses' credibility and to weigh conflicting evidence."[12]

## IV.   DISCUSSION

### A.   The Superior Court Did Not Clearly Err Or Abuse Its Discretion When It Awarded Shawn Primary Custody.

Alaska Statute 25.24.150(c) requires courts to "determine custody in accordance with the best interests of the child." The statute enumerates nine factors for the superior court to consider when making a best interests determination.[13] A superior court abuses its discretion in an initial custody determination when it "fails to consider statutorily mandated factors, weighs factors improperly, or includes improper factors in its decision."[14] A superior court's factual findings are "clearly erroneous when our 'review of the entire record leaves us with a definite and firm conviction that a mistake has been made.' "[15]

---

[12]   *Hockema v. Hockema*, 403 P.3d 1080, 1090 n.23 (Alaska 2017) (quoting *Fink v. Municipality of Anchorage*, 379 P.3d 183, 192 (Alaska 2016)).

[13]   The factors are: (1) the child's physical, emotional, mental, religious, and social needs; (2) each parent's ability and desire to meet those needs; (3) the child's preference; (4) the love and affection existing between the child and each parent; (5) the length of time the child has lived in a stable and satisfactory environment; (6) each parent's willingness and ability to facilitate and encourage a close and continuing relationship between the other parent and the child; (7) any evidence of domestic violence, child abuse, or child neglect in the household; (8) any evidence that substance abuse by either parent or household members affecting the child's physical or emotional well-being; and (9) any other pertinent factors. AS 25.24.150(c).

[14]   *Sweeney v. Organ*, 371 P.3d 609, 612 (Alaska 2016) (quoting *Williams v. Barbee*, 243 P.3d 995, 1000 (Alaska 2010)).

[15]   *Green v. Parks*, 338 P.3d 312, 314 (Alaska 2014) (quoting *Limeres v.*
(continued...)

Francesca argues that the superior court failed to properly apply four of the statutory best interest factors: the length of time the children have lived in a stable environment;[16] each parent's willingness and ability to foster a close and continuing relationship with the other parent;[17] evidence of domestic violence in the parent's household;[18] and evidence of substance abuse in the parent's home.[19] Francesca argues that each of these factors supports awarding her, not Shawn, primary physical custody.

Francesca first argues that factor (c)(5) should favor her: the length of time the children have lived in a stable satisfactory environment, which is meant to "includ[e] 'both emotional stability and geographic stability.' "[20] When determining which parent will provide a child with stability and continuity, the court "may consider a number of subsidiary factors, 'including, but not limited to, the relationship with the custodial parent, the home provided by the custodial parent, the children's school, the community of friends and family, the cultural community, and the children's relationship with the non-custodial parent.' "[21]

---

[15]     (...continued)
*Limeres*, 320 P.3d 291, 295-96 (Alaska 2014)).

[16]     AS 25.24.150(c)(5).

[17]     AS 25.24.150(c)(6).

[18]     AS 25.24.150(c)(7).

[19]     AS 25.24.150(c)(8).

[20]     *Harris v. Governale*, 311 P.3d 1052, 1055 (Alaska 2013) (quoting *Blanton v. Yourkowski*, 180 P.3d 948, 954 (Alaska 2008)).

[21]     *Id.* (quoting *Barrett v. Alguire*, 35 P.3d 1, 9 (Alaska 2001)); *see also Rooney v. Rooney*, 914 P.2d 212, 217 (Alaska 1996) ("Continuity and stability for a child come not only from staying in the same house, or going to the same school.
(continued...)

Francesca and Shawn offered conflicting testimony about which of them had been the girls' primary caregiver. But it was undisputed that the children had spent the majority of their lives in Togiak. Both parents testified that the girls attended school in Togiak and that they were building a new home for them in Togiak. Francesca testified that she wished to return to Togiak eventually. The court found that "Togiak is a community the children know and are comfortable in," that it "ha[d] been stable and healthy," and that "maintaining that continuity is beneficial to the children." Shawn was the parent who remained in Togiak, while Francesca was living in Anchorage. The superior court did not clearly err in finding that this factor favored Shawn.

Francesca next argues that the court did not appropriately consider her "willingness and ability . . . to facilitate and encourage a close and continuing relationship between the other parent and the child."[22] Francesca claims that she demonstrated she was better able to foster a relationship between the girls and Shawn than he was able to foster her relationship with them. The court heard testimony from both Shawn and Francesca that they tried their best to encourage the children to have a relationship with the other parent. It also heard testimony from each parent alleging inappropriate incidents in the other parent's home.

The court found that "[e]ach parent values the relationship the children have with the other parent," but that Francesca and Shawn "disagree on how to facilitate and encourage" that relationship. And the court noted its concern about Francesca "blow[ing] . . . out of proportion" the seriousness of some of her allegations against

---

[21]     (...continued)
Consideration should also be given to social and emotional factors such as who the primary care-giver was for the child and whether the child would be separated from siblings or family members if he was placed with one parent rather than another.").

[22]     AS 25.24.150(c)(6).

Shawn and his fiancée. Finally the court cautioned "[e]ach parent . . . to understand that the custodial parent establishes his/her rules of the home and cannot control the other [parent's] home." The court found that "Shawn understands this; Francesca does not" and blamed her lack of understanding for "undermin[ing] Shawn's role." The record supports the superior court's determination that this factor favored Shawn.

Next Francesca asserts that the superior court failed to consider evidence of domestic violence in Shawn's home.[23] But Francesca only alleged domestic violence *after* the court issued its initial custody order.

Finally Francesca claims the superior court failed to consider factor (c)(8), evidence of substance abuse in Shawn's home.[24] She argues that "there is undeniable evidence of substance abuse . . . in Shawn's home." The only evidence presented on this statutory factor before the initial custody determination was that Shannon had been caught smoking marijuana. Shawn acknowledged the incident happened and testified that he was taking steps to ensure it did not happen again. Francesca presented no evidence about how or where Shannon obtained the marijuana.

We give "particular deference" to the superior court's factual findings "when they are based primarily on oral testimony, because the [superior] court, not this court, judges the credibility of witnesses and weighs conflicting evidence."[25] And we do not "re-weigh evidence when the record provides clear support for the trial court's

---

[23] AS 25.24.150(c)(7).

[24] AS 25.24.150(c)(8).

[25] *Mallory D. v. Malcom D.*, 290 P.3d 1194, 1200 (Alaska 2012) (quoting *Sheffield v. Sheffield*, 265 P.3d 332, 335 (Alaska 2011)).

ruling."[26] "The critical question . . . is . . . whether the evidence as a whole supports the court's decision."[27] The superior court held hearings over two days and considered the custody investigator's reports before issuing its custody order. The record supports each of its determinations that the challenged best interest factors favored Shawn, and we are not left with a definite and firm conviction that a mistake has been made.

The superior court specifically considered each of the best interest factors, listing all nine of them, and explained how it applied them in light of the evidence presented. Francesca has not demonstrated that the court abused its discretion in its weighing of the factors. Nor has she shown that the court considered improper factors when making its decision.[28] Francesca thus has not shown that the superior court abused its discretion by awarding Shawn primary custody.

**B.    The Superior Court Did Not Abuse Its Discretion When It Denied Francesca's Motion To Modify Custody.**

A child custody order "may be modified if the court determines that a change in circumstances requires the modification of the award and the modification is in the best interests of the child."[29] "Modification of a custody determination is a two-step process: first, 'the parent seeking modification must establish a significant change

---

[26]    *In re Adoption of S.K.L.H.*, 204 P.3d 320, 325 (Alaska 2009) (quoting *Tessa M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 182 P.3d 1110, 1114 (Alaska 2008)).

[27]    *Ebertz v. Ebertz*, 113 P.3d 643, 647-48 (Alaska 2005).

[28]    *See Moore v. Moore*, 349 P.3d 1076, 1080 (Alaska 2015) ("There is an abuse of discretion if the superior court 'considered improper factors in making its custody determination.' " (quoting *Frackman v. Enzor*, 327 P.3d 878, 882 (Alaska 2014))).

[29]    AS 25.20.110(a).

in circumstances affecting the children's best interests'; only then is a best interests analysis performed."[30]

We review a superior court's decision that there has not been a substantial change in circumstances for abuse of discretion and underlying factual findings for clear error.[31] We give particular deference to a superior court's factual findings when they are based primarily on oral testimony.[32] We will not reverse a superior court's decision not to modify custody when "the evidence as a whole supports the court's decision"[33] because "the [superior] court, not this court, judges the credibility of witnesses and weighs conflicting evidence."[34]

Francesca first argues that it was error to find that Shannon's disclosures of physical and substance abuse were not credible. Francesca claims that because the court initially found Shannon's disclosures credible after the first child custody investigator interview it should not have found that Shannon was not credible after her subsequent interviews. Francesca also argues that the court "totally misconstrued" the girls' statements in their OCS interviews and "ignore[d]" the OCS caseworker's opinion that the girls did not appear to have been coached.

The superior court heard testimony that those interviewers did not believe either girl had been coached. The court also considered their conclusion that neither girl

---

[30]     *Hunter v. Conwell*, 276 P.3d 413, 419 (Alaska 2012) (quoting *Hunter v. Conwell*, 219 P.3d 191, 196 (Alaska 2009)).

[31]     *Collier v. Harris*, 377 P.3d 15, 20 (Alaska 2016).

[32]     *See Mallory D. v. Malcom D.*, 290 P.3d 1194, 1200 (Alaska 2012).

[33]     *Ebertz v. Ebertz*, 113 P.3d 643, 647-48 (Alaska 2005).

[34]     *Mallory D.*, 290 P.3d at 1200.

had disclosed any physical abuse and that the OCS interviewer did not recall making a referral to law enforcement based on a crime of domestic violence.

The evidence also demonstrated that Shannon made inconsistent statements. The court concluded that Shannon was motivated by a desire to please the parent with whom she was then living. Her May 2019 interview with the custody investigator took place while she was living with Shawn and was negative regarding Francesca. After spending the summer with her mother, she made negative reports about Darian and Shawn and positive ones about Francesca. In her November interview Shannon admitted to the custody investigator that her comments depended on what each parent wanted and that she would "do[] her best to get to be with" either parent. The court specifically weighed this conflicting evidence in its order.

It is the superior court's responsibility to make credibility determinations, including the credibility of children's statements.[35] A court considers numerous factors in its credibility determination,[36] and may pay special attention to the influences over a

---

[35] *Id.* at 1201 ("It is the trial court's responsibility to judge the credibility of witnesses and weigh conflicting evidence.").

[36] *See* Alaska Criminal Pattern Jury Instruction 1.10 (revised 2012) (regarding credibility of witnesses).

child in the midst of a parental custody fight.[37]  The court did not clearly err when it concluded that Shannon's conflicting reports were not reliable.[38]

Francesca also observes that the superior court did not mention Shawn's alleged failure to protect the girls "from Darian's actions" in its order denying the motion to modify custody.  But Francesca did not make such an argument in her motion to modify.  Even if Francesca had made this allegation, it could not serve as a basis for a finding of changed circumstances because the court had previously considered her "concerns . . . about Shawn . . . and about his home" before issuing the initial custody order.[39]

Because Francesca failed to demonstrate a change in circumstances, the superior court did not abuse its discretion by declining to modify custody.

---

[37]  *See Wells v. Barile*, 358 P.3d 583, 589 (Alaska 2015) ("[I]t is within [the superior court's] discretion to conclude that the child's stated preference is unreliable because it is based on a reluctance to hurt either parent or because it is otherwise 'immature or improperly motivated.' " (internal citations omitted) (quoting *Thomas v. Thomas*, 171 P.3d 98, 103 (Alaska 2007))); *see also Rooney v. Rooney*, 914 P.2d 212, 218 (Alaska 1996) ("[W]here a [child's] stated preference results entirely from the child's desire to satisfy his parent's wishes — or because he does not wish to offend either of them — such a preference does not fall within the statutory ambit.").

[38]  Francesca also argues that the court erred when it stated that Shannon was interviewed three times.  While Francesca is correct that there were a total of five interviews, two of them involved Francesca as well as Shannon.  It was not an abuse of the court's discretion to consider only those interviews that were conducted with Shannon alone.

[39]  *See J.L.P. v. V.L.A.*, 30 P.3d 590, 595 (Alaska 2001) (noting change in circumstances must "be demonstrated relative to the facts and circumstances that existed at the time of the prior custody order that the party seeks to modify" (quoting *Jenkins v. Handel*, 10 P.3d 586, 589 (Alaska 2000))).

**C. The Superior Court Did Not Clearly Err Or Abuse Its Discretion When It Divided The Marital Estate.**

The superior court exercises "broad discretion"[40] when dividing property in a divorce, as long as it is done "in a just manner,"[41] as required by AS 25.24.160(a)(4), and guided by the *Merrill* factors.[42] These factors include the duration of the marriage, the parties' earning ability, the conduct of each during the marriage, their station in life, the circumstances and necessities of each, their financial circumstances, and the time and manner of the acquisition of the property in question, along with its value at the time.[43] " '[T]he court is not required to enter findings on each factor' as long as its property order is 'sufficient to indicate the basis of the court's conclusion.' "[44] Francesca argues that the superior court erred in its treatment and distribution of the commercial fishing permit, the green house, and Lot 5, Block 5.

**1. The commercial fishing permit**

Francesca argues that the superior court erred when it found that the commercial fishing permit was Shawn's separate property. The court held that the permit was not marital property because Shawn's grandfather had transferred it to him before he and Francesca married and no evidence was presented that Shawn intended to donate it to the marital estate.

---

[40] *Brennan v. Brennan*, 425 P.3d 99, 106 (Alaska 2018) (holding that "the [superior] court has broad discretion in [the] area [of property division]").

[41] *Hockema v. Hockema*, 403 P.3d 1080, 1088 (Alaska 2017) (quoting AS 25.24.160(a)(4)).

[42] *Id.*

[43] *Merrill v. Merrill*, 368 P.2d 546, 547 n.4 (Alaska 1962).

[44] *Hockema*, 403 P.3d at 1088.

Francesca argues that the permit is marital property because she and Shawn pledged it as collateral for a new boat and because she was a partner in the fishing operation. She objects to the trial court's description of her as a crew member, arguing that she should be considered a partner because "she helped manage the fishing business" and that the permit was therefore transmuted into marital property.

Francesca overlooks both her own testimony and Shawn's testimony that she was a crew member. In contrast there was only a single passing mention of Francesca and Shawn being partners in Francesca's testimony about their approach to paying "GCI bills, . . . electricity, . . . get[ting] stove oil, . . . [and] food for our daughters" with the money earned from fishing.

As the party seeking to prove that Shawn's fishing permit, which was his separate premarital property, had transmuted into marital property, Francesca had the burden to show that Shawn intended to donate it to their marital estate.[45] But the superior court found that Francesca presented "no such evidence." Both Francesca's and Shawn's testimony provided clear support for the court's finding that Francesca was a crew member. The superior court did not clearly err when it found that the permit had not transmuted to marital property.[46]

### 2. The green house

The superior court found that the green house where Shawn and Francesca lived with the girls throughout their marriage was "not marital property because Shawn

---

[45] *See Kessler v. Kessler*, 411 P.3d 616, 621 (Alaska 2018) (noting that party claiming separate property has been transmuted into marital property "ha[s] the burden to prove" that the other party "intended to donate the [disputed property] to the marital estate").

[46] *Limeres v. Limeres*, 320 P.3d 291, 296 (Alaska 2014) (stating that this court reviews the superior court's factual findings regarding contributions to the marital estate for clear error).

[was] not the owner of the home." The court credited Francesca's "believabl[e]" testimony that she thought the house had been given to them as a couple, and that Francesca had contributed to building an addition on the house. The court therefore concluded that the value of the addition was marital property. It valued the "marital contributions to the home at $10,000" and awarded Francesca "half of the contributions to the [g]reen [h]ouse ($5,000)."

Francesca claims there "was insufficient evidence" to support the court's finding that the green house did not belong to Shawn. She argues that Shawn would not have invested his time and money in the house if he did not believe he owned it, but Shawn testified that the green house belonged to his mother because his grandfather willed it to her and he was simply using it. His mother, who also testified, corroborated Shawn's testimony.

Francesca also argues that the court's valuation of the addition to the green house was clear error because it accepted "Shawn's testimony over Francesca's regarding the value" of the green house. But neither she nor Shawn provided any evidence other than their testimony about the value. Despite describing her contributions in detail, Francesca failed to provide any receipts establishing the actual costs of her labor, and conceded that she was "guessing" about the $50,000 value.[47] Shawn, on the other hand, testified that they "didn't put $50,000 into it," but agreed that the contributions to the house were marital property amounting to "around $10,000." Like Francesca, he provided no receipts to support his valuation of the marital contributions.

---

[47] She admitted "[i]t wasn't actually appraised or anything."

Because "it is the function of the [superior] court, not of this court, to judge witnesses' credibility and to weigh conflicting evidence,"[48] we "will not second-guess the [superior] court's judgment . . . where its determination is supported by the record."[49] Francesca presented no evidence to rebut Shawn's and his mother's testimony that Shawn did not own the green house. The superior court appropriately credited their testimony over Francesca's, while acknowledging that Francesca credibly believed that the green house was marital property. Nor did the court err in its valuation of the marital contributions to the house. No evidence in the record contradicts the court's valuation of the addition, and Francesca herself acknowledged she was "guessing" about the addition's value. The court did not clearly err by relying upon Shawn and his mother's testimony to find that the green house was not marital property because it did not belong to Shawn or by valuing the addition to the green house at $10,000.

### 3.    Lot 5, Block 5

Finally, Francesca argues that the superior court erred when it valued Lot 5, Block 5 at $50,000 and awarded it to Shawn. She notes that "the deed was always in her name" and that she "contributed to the labor for the house and helped purchase materials." She claims that her "testimony that it was worth $70,000" was "much more detailed [than Shawn's]" and asks us to remand the case to the superior court "to assess the property based on the evidence on the record and distribute it to [her]." She also argues that by awarding the property to Shawn the court deprived Francesca of a residence.

---

[48]    *Hockema*, 403 P.3d at 1090 n.23 (quoting *Fink v. Municipality of Anchorage*, 379 P.3d 183, 192 (Alaska 2016)).

[49]    *Id.* at 1090.

Both Francesca and Shawn estimated that Lot 5, Block 5 was worth $70,000. Shawn testified, however, that the parties spent closer to "[$]25 or 30,000." The court accepted his estimate of the value of the improvements made. But it rejected the couple's estimate that the property as a whole was worth $70,000, instead valuing it at $50,000.

The court's decision rests largely on its credibility determination because neither Francesca nor Shawn presented any evidence to support the $70,000 estimate. And as we have noted, it is the superior court's job, not ours, to make those determinations.[50] Even if the court did not fully explain its rejection of the agreed-upon $70,000 value, its $50,000 value does not leave us "with a definite and firm conviction . . . that a mistake has been made."[51] The court did not clearly err when it valued Lot 5, Block 5.

The court also did not abuse its discretion when it awarded Lot 5, Block 5 to Shawn. The court awarded Shawn primary custody of the girls, relying in part on their virtually lifelong residence in Togiak. It also heard testimony that the parents had bought Lot 5, Block 5 specifically to build a larger family home and move out of the green house.

Alaska Statute 25.24.160(a)(4)(F) specifically authorizes the superior court when dividing a marital estate to consider "the desirability of awarding the family home

---

[50] *Id.* at 1090 n.23.

[51] *Heather W. v. Rudy R.*, 274 P.3d 478, 481 (Alaska 2012) (alteration in original) (quoting *Barrett v. Alguire*, 35 P.3d 1, 5 (Alaska 2001)); *see also Hockema*, 403 P.3d at 1090 (affirming superior court's valuation of home because it "was supported by evidence in the record"); *Beals v. Beals*, 303 P.3d 453, 459 (Alaska 2013) (holding that court's valuation of assets is factual determination reviewed for clear error).

. . . to the party who has primary physical custody of the children." The superior court did just that; it was not clear error to award Lot 5, Block 5 to Shawn.

Francesca also argues that the court's award of Lot 5, Block 5 to Shawn resulted in an "unequal distribution of property" because it left her without a valuable income-producing property and deprived her of a residence. Francesca's argument overlooks the fact that the court awarded her "steel building material" and a "container van" specifically so that each spouse received "an asset that has income-producing capabilities." And Francesca testified that she "eventually" planned to return to Togiak, but that she was currently living in Anchorage and looking for legal jobs. On the other hand, Shawn remained in Togiak with the girls and expressed no intention of leaving. The court's award of the Togiak property to Shawn had no impact on Francesca's residence, which was in Anchorage. And the court followed AS 25.24.160(a)(4)(F) when it awarded the Lot 5, Block 5 property to Shawn. There is no evidence in the record that indicates the property division was not done "in a just manner"[52] or resulted in an unequal distribution as Francesca claimed.

The superior court did not clearly err or abuse its discretion when it determined that neither the fishing permit nor the green house was marital property, or when it valued Lot 5, Block 5 and awarded it to Shawn.[53] The superior court's division was neither unequal nor done in an unjust manner.

## V.  CONCLUSION

We AFFIRM the superior court's custody and property orders.

---

[52]     *Hockema*, 403 P.3d at 1088.

[53]     *See Beals*, 303 P.3d at 459 (noting that a superior court's "valuation of assets[] is a factual determination that we review for clear error" and whether property was equitably allocated is reviewed for "abuse of discretion").