930 P.2d 409 (1996)
J.F.E., Appellant,
v.
J.A.S., Appellee.
No. S-7501.
Supreme Court of Alaska.
December 13, 1996.
Rehearing Denied January 31, 1997.
Kenneth C. Kirk, Anchorage, for Appellant.
Ernest Z. Rehbock, Rehbock & Rehbock, Anchorage, for Appellee.
Before COMPTON, C.J., and RABINOWITZ, MATTHEWS, EASTAUGH and FABE, JJ.
MATTHEWS, Justice.
The issue in this case is whether the trial court erred in restricting a father's visitation privileges with his daughter to visits under the supervision of a third party. We conclude that a number of the findings made by the court concern incidents which are too removed in time and too trivial to support supervised visitation. We conclude further that while unrestricted visitation is the norm, supervised visitation can be required when the court makes findings which specify why unsupervised visitation is contrary to the best interests of the child. We remand for further proceedings conducted in accordance with these conclusions.
Appellant J.F.E. (John)[1] and appellee J.A.S. (Jane) are the parents of Rebecca, born in February 1989. John and Jane were never married. They lived together until May 1990. The parties agree that John was the primary care giver of the child from September 1989 until the parties separated. Thereafter Rebecca lived with Jane but John exercised visitation privileges. In November 1990 Jane prohibited John from further visitation, claiming that he had sexually molested Rebecca.
In January 1993 John filed a complaint for custody. In June 1994 John was permitted *410 supervised visits with Rebecca. Trial began in August 1994 and was spread out over six months, consuming seven trial days. Following the trial the court entered findings of fact and conclusions of law and decreed that custody of Rebecca should be with Jane and that John was entitled only to supervised visits.
In support of the supervised visitation limitation, the court referred to conduct of the child described as "sexual acting out." Concerning this behavior the court made the following findings:
7..... The court notes that in spite of the fact that no medical doctor has shown any physical indication of sexual abuse, [Rebecca] continues to act out with persons other than her mother in a sexually explicit manner, and certainly inconsistent with behavior of a child of her age and maturity.
....
12. This case has also been complicated by [Rebecca] exhibiting sexual acting out in that she has extremely terrifying nightmares and acts out sexually in a way which indicates one of three things, according to Dr. Laura Jones during her third time testifying. One would have been that she has been sexually abused in the past; two, sexual abuse is occurring presently which is very doubtful in that she [is] only having supervised visitation with her father and not much other contact with other males other than her godfather ...; third and finally, she could be acting out of anxiety that she is picking up verbally through her mother, which the court does not believe, nor did the experts.
13..... The evidence does not support finding that [John] himself has abused [Rebecca], but that she has exhibited, and the court does find that she was sexually abused based on her actions and the supporting testimony of Dr. Laura Jones, and Dr. Karen Sensig.
....
15..... The fact that [Rebecca] continues to act out sexually is of concern to the court, and as Dr. Jones said had visitation not begun, she would not have recommended that visitation start without much more counseling for [Rebecca] so that she does not have the anxiety after visits with her father nor does she have the nightmares and the sexual acting out that has continued.
Apart from concerns based on the child's acting out behavior, the court gave significant weight to a video tape and still photos which John took of Rebecca when the child was two years old or younger. Two of the photos were of Rebecca sitting unclothed in a bowl on a stove top. Other still photos and the video tape included scenes of the child while she was bathing. The court made numerous references to the photos and the video tape in its findings and conclusions:
[Finding] 4..... The court needs to consider the needs of the child in that [Jane] appears to be most attentive to the needs of the child, [Rebecca] whereas, at least early on as exhibited by the evidence submitted in open court, [John] is not sensitive to the needs of the child in that he allowed the child to be in an unsafe situation in a bath tub while being video taped without talking to the child, playing with the child, and doing anything other than taking the video picture of the child. Moreover, there was evidence submitted that [John], in what appeared to be at least in a negligent way, placed the child in a large pyrex type glass bowl on the stove and took pictures of her sitting on the stove, thinking it was "cute," which could have resulted in her falling while making a quick movement and severely injuring herself if not causing cuts that could be deadly.
....
[Finding] 9. There is an issue regarding special needs unique to this child in that [John] apparently has little sensitivity to the child's personal needs as exhibited by his prior actions in photographing the child, and taking video tapes and not even acknowledging or talking to the child. The taking of such video tape by [John] appeared to demonstrate his lack of sensitivity regarding his child's needs while she was younger, and the court recognizes that at her present age she is fluent in the English language and able to express herself verbally in a way where that aspect of *411 the father/daughter relationship may not be as significant.
....
[Finding] 11..... [T]here was substantial evidence of child neglect proven to the court's satisfaction in [John's] household and no evidence of any such neglect in [Jane's] household. In particular, the neglect indicated would be the way in which [John] had "posed" his daughter for photographs and video tapes which is apparent to the court in viewing the photographs and video tape. Children [Rebecca's] age at the time the video tapes and photos were taken are much too unsophisticated to do anything more than simply playing and smile. None of the experts believe that such "posing" was appropriate for the age of the child. Moreover, the court does deem it neglectful on [John's] part to ignore the cooing and pre-verbal sounds that [Rebecca] was making while he was video taping her at the time she was in her infancy, plus the fact she appeared to be standing in a slippery bath tub and jumping in a way that could cause her to fall and severely injure herself while he was taking the video tape. The court would note that [John] was not in the picture while the child was jumping and has no hand on her which would indicate to the court that the practice was unsafe. As previously indicated, [Rebecca] is approximately six (6) years of age at the present time, so these particular concerns are no longer in existence.
....
[Conclusion] 2..... However, because of [John's] poor judgment regarding his relationship with his daughter in the way in which he photographed her, and was not aware of safety issues, it would be in the continued best interest of [Rebecca] that [John] continue to receive only supervised visits until Rebecca has self protection skills to report deviant behavior by anyone....
[Conclusion] 3. The court will note that it was not just the fact that there were some nude photographs and video tapes taken of [Rebecca] in her infancy, but that many of them were inappropriate, to which [John] agreed, in hindsight. This agreement by [John] is encouraging to the court, but does show that, at least at the time they were taken, he was exercising poor judgment, and may still exercise poor judgment in the absence of psychotherapy.
We reverse a trial court's resolution of child custody issues when we are convinced that the record shows an abuse of discretion or if controlling factual findings are clearly erroneous. Farrell v. Farrell, 819 P.2d 896, 898 (Alaska 1991).
On appeal John makes two arguments. First, he argues that the trial court's findings based on the photographs and video tapes do not support the conclusion that supervised visitation is needed. Second, he contends that supervised visitation should only be imposed where the court finds that unsupervised visitation would be dangerous to a child's physical or mental health, and the court did not make findings sufficient to meet this standard. Jane generally argues that the trial court's findings are not clearly erroneous and that restricting visitation fell within the broad discretion afforded trial courts in fashioning custody and visitation decrees.
Turning to John's first point, we have reviewed the photographs and video tape. They are not untypical of baby pictures taken by non-abusive parents. The court condemned the photos and tape as inappropriate in themselves, and found that John had exercised poor judgment in taking them. The court did not find them to be lewd or salacious, or evidence of conduct preparatory to sexual abuse, or evidence of sexual abuse. In the absence of any such findings, we are unaware of any legal basis for condemning the materials or criticizing John for taking them and we conclude that the court erred in making such judgments.
In addition, the court found that the photographs indicated that John was insensitive to the needs of the child because he allowed her to stand up in the bath and because she might have fallen out of the bowl on the stove. The court also referred to this conduct as "neglect." These conclusions are of doubtful validity given the fact that John was obviously close at hand when the photos and *412 video tape were taken. Further, the incidents were too distant in time and isolated in character to be indicative of any general tendency toward insensitivity on the part of John to child safety issues.
John summarized the trial court's findings concerning the photographs and video tape as follows:
This was a case in which trivia took the front seat. The trial court appears to have taken some fairly innocent and innocuous photographs and video tapes, and greatly exaggerated their importance.
We agree that the video tapes and photographs are too innocent and innocuous to furnish a sufficient basis for the court's decision to restrict John's visitation privileges.
However, not all the findings made by the trial court relate to the photographs and video tape. The trial court also found that "horrible nightmares have been reported to be worse after [Rebecca] visits with her father, even though the visits are supervised and [John] has done nothing during such visits." Another finding accepts by implication a psychologist's statement that Rebecca has increased anxiety and sexual acting out after visits with her father. Although the trial court has not made a finding in this regard, it is possible that these effects would be worse if John's visits with Rebecca were unsupervised. Depending on their severity, these effects could justify supervised visitation, less frequent visitation, or even a cessation of visitation.
Because it is impossible to determine whether the findings concerning the photographs and video tapes played a dispositive role in the court's decision, we conclude that a remand to the trial court for clarification is necessary.
John's second argument is that supervised visitation is a major disruption of a parent's visitation rights[2] and that it therefore should only be imposed where there exist compelling reasons for doing so. Accordingly, John proposes that we hold that supervised visitation should only be imposed where the court finds that unsupervised visitation would be dangerous to a child's physical, mental, moral, or emotional health.
The standard John suggests is drawn from the Uniform Marriage and Divorce Act (1970). Section 407(b) of the Act provides that visitation should not be limited by restrictions such as supervised visitation unless the trial court makes a special finding that without the restriction visitation would endanger seriously the child's "physical, mental, moral or emotional health."
The visitation order in this case is governed by AS 25.20.060(a). That section states, "In a custody determination under this section, the court shall provide for visitation by a grandparent or other person if that is in the best interests of the child." Thus, this section embodies the "best interest" standard. The section of the Uniform Marriage and Divorce Act which John suggests we adopt was intended as a modification of this standard. As the comment to that section *413 states, the serious endangerment standard "was deliberately chosen to indicate its stringency when compared to the `best interest standard' traditionally applied to this problem." Unif.Marriage and Divorce Act, § 407(b) comment, 9A U.L.A. 612-613 (1973). This distinction between the two standards is reflected in the case law and the commentary on section 407(b). E.g., In re Marriage of Diehl, 221 Ill. App.3d 410, 164 Ill.Dec. 73, 86, 582 N.E.2d 281, 294 (1991) (holding that it is reversible error to apply best interest standard rather than serious endangerment standard adopted by legislature); Margaret Tortorella, Note, When Supervised Visitation Is in the Best Interests of the Child, 30 Family Law Quarterly 199, 202 (1996) ("The express purpose of this language was to modify the traditional `best interest of the child' rule by placing a stricter burden on the court and on the custodial parent seeking to curtail visitation. The drafters hoped that requiring a special showing that visitation would endanger the child's health would prevent courts from denying visitation to the noncustodial parent on the basis of `irrelevant moral judgments about' the parent's behavior."). Because section 407(b) of the Uniform Act is a modification of our statutory best interests standard, we decline to adopt it.
The discretion implicit in the best interests standard must be exercised within statutory limits. We note that under AS 25.20.060(a), the superior court on remand must consider the factors listed at AS 25.24.150(c) in determining Rebecca's best interest. These factors include, much like the standard suggested by John, "the physical, emotional, mental, religious, and social needs of the child." AS 25.24.150(c)(1). They also include "the capability and desire of each parent to meet these needs." AS 25.24.150(c)(2).
Furthermore, the court's consideration of these factors must take into account the legislature's express intent in enacting AS 25.20.060:
The legislature finds that it is generally desirable to assure a minor child frequent and continuing contact with both parents after the parents have separated or dissolved their marriage and that it is in the public interest to encourage parents to share the rights and responsibilities of child rearing. While actual physical custody may not be practical or appropriate in all cases, it is the intent of the legislature that both parents have the opportunity to guide and nurture their child and to meet the needs of the child on an equal footing beyond the considerations of support or actual custody.
Ch. 88, § 1, SLA 1982.
Moreover, AS 47.10.084 recognizes in the context of child-in-need-of-aid proceedings that noncustodial parents have certain residual rights and responsibilities including "the right and responsibility of reasonable visitation." AS 47.10.084(c).[3] It follows that a similar residual right of reasonable visitation should exist in private custody proceedings since parents in such proceedings are no less deserving of contact with their children than parents of children whose custody has been committed to the state.
Based on these provisions and on the statutes dealing with child custody,[4] we infer that the best interests of the child standard normally requires unrestricted visitation with the noncustodial parent. Therefore, an order requiring that visitation be supervised must be supported by findings that specify how unsupervised visitation will adversely affect the child's physical, emotional, mental, *414 religious, and social well-being and the other interests set out at AS 25.24.150. Because the trial court did not make such findings, a remand for this purpose is also required.
Finally, we observe that the trial court has not outlined a plan under which supervised visitation might be terminated in the present case. If such supervision is found on remand to be in the best interest of Rebecca, the court should consider whether to order periodic reviews of the continuing need for the restriction and whether to establish criteria which might signal the end to the need for the restriction.
In conclusion, because the trial court relied on findings which do not support the need for supervised visitation and did not make specific findings addressed to the need for supervised visitation, the judgment in this case is VACATED, insofar as it mandates supervised visitation, and this case is REMANDED for further proceedings consistent with this opinion.
NOTES
[1] The names of the parties and their child are pseudonyms.
[2] John described a number of the problems that can be encountered by a parent who is subjected to a decree requiring supervised visitation:

Among other things, it may be difficult to find another adult, suitable to the court, who is willing to tag along on someone else's visits with their child on a regular basis. It makes overnight visitations, such as the ubiquitous every-other-weekend, impossible. It increases the likelihood that visits will have to be canceled due to illness or unavailability of the supervisor. If the only alternative is to hire a paid supervisor, it may place a significant financial burden on the parents. It may also require additional expenditure if the visit will include restaurants, carnivals, movies, or other situations in which it is necessary to pay for each individual attending. And, as supervised visitation is typically "sight and sound" supervision, there may be many other small but intrusive restrictions as well. At the December 16, 1994 hearing the father's counsel complained about a number of things the father had wanted to do, which had been vetoed by the supervisor: he had not been allowed to take the child ice skating because the supervisor did not skate and thus could not hear what was said between them; he had not been able to take her swimming; he had not been able to take her to movies unless the supervisor sat in the chair between them; and if he and his daughter sat next to each other in a restaurant, his hands were required to be visible above the table at all times. Also, the mere presence of a supervisor suggests strongly to the child that her parent is one who is not safe or cannot be trusted.
[3] We have held that in a child-in-need-of-aid proceeding a parent's right to reasonable visitation cannot be eliminated except upon proof by clear and convincing evidence that the best interests of the child so required. K.T.E. v. State, 689 P.2d 472, 478, n. 11 (Alaska 1984). The clear and convincing evidence standard does not, however, apply to restrictions on parental visitation which are not a de facto termination of a parent's right of reasonable visitation. D.H. v. State, 723 P.2d 1274, 1277 (Alaska 1986). Supervised visitation is not a de facto termination of reasonable visitation rights. Id. at 1278 n. 1 (Rabinowitz, J., dissenting); Lightbourne v. Lightbourne, 179 A.D.2d 562, 578 N.Y.S.2d 578 (1992).
[4] See, e.g., AS 25.20.060(c), which provides:

The court may award shared custody to both parents if shared custody is determined by the court to be in the best interests of the child. An award of shared custody shall assure that the child has frequent and continuing contact with each parent to the maximum extent possible.