NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| HELEN M., | ) |
| | ) Supreme Court No. S-18441 |
| Appellant, | ) |
| | ) Superior Court No. 3PA-18-01986 CI |
| v. | ) |
| | ) MEMORANDUM OPINION |
| BREANDAN C., | ) AND JUDGMENT* |
| | ) |
| Appellee. | ) No. 2016 – March 6, 2024 |
| | ) |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Palmer, Jonathan A. Woodman, Judge.

Appearances: Nathan T. Henshaw, Henshaw Law, Anchorage, for Appellant. Breandan C., pro se, Palmer, Appellee.

Before: Maassen, Chief Justice, and Carney, Borghesan, Henderson, and Pate, Justices.

## I. INTRODUCTION

A father petitioned for modification of a shared custody arrangement after his ex-wife left Alaska and failed to communicate with their three children for months. Following an evidentiary hearing, extensive fact-finding by a superior court master, and de novo review, the superior court awarded the father sole legal and primary physical custody and allowed the mother only supervised visitation pending her satisfaction of

---

\* Entered under Alaska Appellate Rule 214.

certain conditions.  The mother appeals.  Seeing no error or abuse of discretion, we affirm the superior court's decision.

## II.    FACTS AND PROCEEDINGS

### A.    Facts

Breandan C. and Helen M.[1] divorced in 2019 and shared legal and physical custody of their three children under the terms of a court-approved settlement agreement.  They adjusted their parenting schedule in January 2020 and generally followed the adjusted schedule until March of that year, when Breandan suffered an epileptic seizure and the parents agreed that the children should stay with Helen until he recovered.  According to Breandan, however, Helen refused to return the children to his custody when promised.  She then brought the children to Breandan's home in mid-May and did not return for the entire summer; several months went by without any contact between her and the children.

In early September, Helen's physician sent her to an Anchorage hospital for treatment of a heart condition, and she was held there involuntarily for six or seven days due to her providers' concerns for her mental health.  After being discharged she traveled to Montana to recuperate and regain her health.

Helen contacted the children around five times over the next six months. She experienced housing instability during this time and sent messages to her mother threatening suicide.  In March 2021 Breandan petitioned to modify custody, asking that he be awarded sole legal and primary physical custody because of Helen's long absence from the state and her history of "negative and obstructionist statements and behavior."

Helen returned to Alaska in July 2021, before the first hearing on Breandan's motion to modify custody.  She went to Breandan's house unannounced, asked to see the children, and refused to leave the area.  Breandan filed two petitions

---

[1]    We use the parties' initials to protect their privacy.

for an ex parte domestic violence protective order, the second of which was granted at the end of July.

B.      Proceedings

1.      Motion to modify custody, visitation, and support

Breandan argued in his motion to modify custody that it was in the children's best interests for him to have sole legal and primary physical custody. He proposed that Helen "have visitation with the children for eight weeks each summer" and alternating spring and winter school vacations. He later modified this request, asking that Helen have only supervised visitation and that she be required to undergo a psychological evaluation and follow the recommendations of the evaluator before visitation could be liberalized.

A hearing was held over five days in August and September 2021 in front of a superior court standing master. A number of witnesses testified, including Breandan, his partner, Helen, her mother, family friends, healthcare professionals, and police officers.

Much of the testimony focused on Helen's mental health and recent behavior. Her mother had serious concerns for her daughter's well-being, testifying that Helen's behavior had "really terrified" her and that Helen had expressed desires to "blow up" the police department and the hospital. The master found credible the mother's testimony "that she had been contacted on at least five occasions . . . regarding [Helen's] suicide attempts and plans."

Helen testified that she went to Montana to recover from trauma and stress, and that she spent her time there working on her health with therapists and other healthcare providers. But other things she said proved concerning to the court. She admitted bringing a loaded firearm to her mother's home in the spring of 2020 when her children were there because she believed Breandan presented a threat to their safety. She testified that she believed the hospital had induced her heart attack that September

on purpose and hid it from her, and she repeatedly described her subsequent mental-health hold as a "medical kidnapping."

But several other witnesses testified positively about Helen's recent improvement, newfound stability, and fitness to parent. The court heard from a Montana mental health counselor who "continued to have weekly sessions with" Helen, although the court discounted his testimony because "he appeared to have little grasp on the totality of [her] circumstances due to his information being primarily based on her self-report."

### 2. The custody and visitation order

The master issued a detailed report and order recommending that custody and visitation be modified so that Breandan would have sole legal and primary physical custody and Helen's visitation would be limited. The master found a substantial change in circumstances in Helen's sudden departure from Alaska in 2020 and her "failure to meaningfully communicate with or support the children until July of 2021." Finding the testimony of Helen's mother particularly "credible and helpful" — including her expression of concern for her daughter's mental state and for the danger Helen "posed . . . to herself, her children, and . . . [Breandan]" — the master further found that Helen's "prolonged period of instability . . . appears to be a significant departure from her circumstances" in 2019.[2]

---

[2]     The first paragraph of the master's order states that "[a]fter considering the evidence presented, the Master finds that there has not been a substantial change in circumstances," whereas the order later states, "[t]he Master finds by a preponderance of the evidence that there has been a substantial change in circumstances that materially affected the children." Because the master's discussion of the evidence supports a finding of a substantial change in circumstances, and because the master went on to recommend a change in custody, it is clear to us that the first statement was a clerical error and the latter actually reflects the master's intent. On review, the superior court modified the master's order accordingly.

Having found a substantial change in circumstances, the master went on to analyze the best interests factors in AS 25.24.150(c). Regarding the children's needs, the master found that they were best met by Breandan because he and his partner had been primarily responsible for their upbringing since May 2020, and the children "enjoy[ed] a structured environment" in his home. As for the parents' respective abilities to meet those needs,[3] the master found that although both parents desired to meet the children's needs, Helen was "currently incapable" of doing so, and it was "unclear given her mental state how long it [would] be before [she] establishe[d] stability again."[4] The master noted in contrast that Breandan had "maintained steady employment," had "consistently paid child support," and was thus "better suited to provide for the needs of the children at this time."

On the stability and continuity of the children's living situation,[5] the master found that the children had lived in a stable, satisfactory environment with Breandan since May 2020 and that he was better able to provide a stable environment going forward. The master had concerns with "the willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child"[6] because each parent had "trespassed the other parent from their property." But the master noted that while Helen had "disparaged . . . Breandan in front of the children," Breandan had testified credibly that he "encouraged the children to write letters to their mother and call her during her absence."

---

**3**    *See* AS 25.24.150(c)(2).

**4**    The master cited the facts that Helen "continue[d] to deny that she experienced a period of significant mental distress and instability in Montana" and "continue[d] to believe, irrationally, that she was kidnapped by [hospital] staff" and that prior colleagues had "conspired against her."

**5**    *See* AS 25.24.150(c)(5).

**6**    *See* AS 25.24.150(c)(6).

The remaining best interests factors were either neutral or irrelevant.[7]  The master weighed the relevant factors and concluded that it was in the best interests of the children for Breandan to be awarded sole legal and primary physical custody.

The master further found that "unsupervised visitation [between Helen and the children] would likely adversely affect the children's physical, emotional, mental and social wellbeing."  The master cited, among other concerns, Helen's prolonged absence from the state and her failure to "meaningfully contact or support [the children] during her absence."  The master also found that the children were "fairly young and vulnerable, and . . . unable to protect themselves should . . . Helen attempt to leave the state with [them]."

Although clearly concerned about whether there was an existing "path to unsupervised visitation," the master recommended that Helen "be ordered to complete a comprehensive psychological evaluation with a qualified provider . . . and that she be ordered to follow all recommendations following the evaluation."  The master continued:  "With therapeutic intervention as well as other means of demonstrating stability and ability to provide for the children's needs, . . . [Helen] could progress to unsupervised visitation."  The master opined that if Helen was "consistent in her visitation with the children in addition to the . . . other orders for therapeutic intervention, . . . unsupervised visitation [could become] more of a reality."

---

[7]  *See* AS 25.24.150(c)(3) ("the child's preference if the child is of sufficient age and capacity to form a preference"), (4) ("the love and affection existing between the child and each parent"), (7) ("any evidence of domestic violence, child abuse, or child neglect in the proposed custodial household or a history of violence between the parents"), (8) ("evidence that substance abuse by either parent or other members of the household directly affects the emotional or physical well-being of the child").

The master recommended that, in the meantime, Helen should have at least six hours of supervised visitation per week. She also recommended that Helen be ordered not to contact Breandan except by text message to arrange for visitation.

The superior court conducted a de novo review of the evidence and adopted the master's recommendations with a few minor modifications not relevant here. Helen appeals.

## III. STANDARD OF REVIEW

"The trial court has broad discretion in determining child custody issues"; those determinations, therefore, "will be reversed 'only if, after a review of the entire record, we are convinced that the trial court abused its discretion or that the controlling factual findings made by the trial court are clearly erroneous.' "[8] "This 'broad discretion' applies to the determination whether there has been 'a substantial change in circumstances affecting the child.' "[9]

The court's broad discretion also extends to "whether a proposed child-custody modification is in the child's best interests. We will set aside the superior court's best interests determination only if the trial court abused its discretion or if the fact findings on which the determination is based are clearly erroneous."[10] "Abuse of discretion is established if the trial court considered improper factors in making its custody determination, failed to consider statutorily mandated factors, or assigned disproportionate weight to particular factors while ignoring others."[11]

---

[8] *Georgette S.B. v. Scott B.*, 433 P.3d 1165, 1168 (Alaska 2018) (quoting *Barrett v. Alguire*, 35 P.3d 1, 5 (Alaska 2001)).

[9] *Id.* (quoting *Heather W. v. Rudy R.*, 274 P.3d 478, 482 (Alaska 2012)).

[10] *Rego v. Rego*, 259 P.3d 447, 452 (Alaska 2011) (citations omitted).

[11] *Joy B. v. Everett B.*, 451 P.3d 365, 368 (Alaska 2019) (quoting *Hamilton v. Hamilton*, 42 P.3d 1107, 1111 (Alaska 2002)).

"We will conclude that a factual finding is clearly erroneous if, based on a review of the entire record, the finding leaves us with a definite and firm conviction that a mistake has been made; we may conclude a finding is clearly erroneous even if there is some evidence in the record to support the finding."[12]

## IV. DISCUSSION

### A. The Superior Court Did Not Abuse Its Discretion By Awarding Breandan Sole Legal And Primary Physical Custody Of The Children.

A superior court may modify prior custody and visitation orders if there has been a substantial change in circumstances that justifies modification and the modification is in the best interests of the child.[13]  If the moving party shows "a substantial change in circumstances, as a threshold matter," then "the court moves on to consider the best interests analysis."[14]  The best interests analysis takes into account the factors listed in AS 25.24.150(c).[15]

#### 1. The superior court did not clearly err or abuse its discretion in determining that there was a substantial change in circumstances.

The superior court adopted the master's findings regarding a substantial change in circumstances.  Helen argues that this was error, and that even if circumstances had changed, the court did not sufficiently explain how any change adversely affected the children's welfare.

---

[12]    *Rego*, 259 P.3d at 452 (citing *Ebertz v. Ebertz*, 113 P.3d 643, 646 (Alaska 2005)).

[13]    *Barrett*, 35 P.3d at 5 (quoting AS 25.20.110(a)).

[14]    *Rego*, 259 P.3d at 452.

[15]    *See Barrett*, 35 P.3d at 6.

But comparing "the circumstances in the aggregate" to the baseline circumstances at the time of the divorce decree in 2019,[16] we conclude that the evidence clearly supports the court's determination that a substantial change had occurred. There was testimony about Helen's abrupt move out of state, her subsequent lack of communication with the children, her threats of suicide and violence toward others (including an expressed desire to kill one of her doctors), her embrace of unlikely conspiracy theories, and the general decline in her mental health over the preceding year. Much of this testimony was from Helen's own mother, whose testimony the master found "to be the most credible and helpful to the court." We give particular deference to the trial court's assessment of witnesses' credibility and to those factual findings that are based primarily on oral testimony.[17]

The court also adopted the master's finding that these changes "materially affected the children." This conclusion is supported by the undisputed fact that the children experienced about a year without meaningful contact or support from their mother once she abandoned the shared custody arrangement. Given the court's factual findings, which are not clearly erroneous, it was not an abuse of discretion to conclude that a substantial change in circumstances justified a modification of custody.

**2.    The superior court did not clearly err or abuse its discretion in finding that it was in the children's best interests that Breandan have sole legal and primary physical custody.**

The master's custody recommendation, which the superior court adopted, provided that Breandan be awarded sole legal and primary physical custody of the children. In formulating this recommendation the master considered the relevant statutory factors, as described above, and found that Helen was "currently incapable of

---

[16]    *See Heather W. v. Rudy R.*, 274 P.3d 478, 482 (Alaska 2012) (affirming finding of substantial change in circumstances based on "the circumstances in the aggregate," including one parent's "pattern of conduct").

[17]    *Sheffield v. Sheffield*, 265 P.3d 332, 335 (Alaska 2011).

meeting [the children's] needs" due to her mental health issues and her lack of stability. The superior court on de novo review agreed that "the current state of [Helen's] mental health remains a cause for concern," citing the testimony about her "suicidal and homicidal ideations" and her "multiple paranoid beliefs."

Helen argues that the custody order was an abuse of discretion and that the court's findings were clearly erroneous. She argues in particular that "there was no credible evidence to support the trial court's findings that . . . [she] is unable to meet the children's needs," that the court overlooked positive testimony about her stability and mental health treatment, that it gave too much weight to her mother's testimony and too little to the testimony of her medical providers and witnesses who had personally observed her with the children, and that it failed to explain how the children were negatively affected by her behavior. She also contends that the court did not make the findings required for each of the factors listed in AS 25.24.150(c), and specifically that the court "failed to sufficiently analyze" the domestic violence factor.[18]

The superior court does not need to discuss all the best interests factors, only those "that are actually relevant in light of the evidence presented."[19] The court's findings "must at a minimum 'give us a clear indication of the factors which [it] considered important in exercising its discretion or allow us to glean from the record what considerations were involved.' "[20] Here, the master's extensive discussion of the facts and the superior court's order on de novo review satisfy these requirements; we know what factors they considered and why. As for the domestic violence factor that

_____

**18**    *See* AS 25.24.150(c)(7) (requiring court to consider "any evidence of domestic violence, child abuse, or child neglect in the proposed custodial household or a history of violence between the parents").

**19**    *Peterson v. Swarthout*, 214 P.3d 332, 337 (Alaska 2009) (quoting *Thomas v. Thomas*, 171 P.3d 98, 102-03 (Alaska 2007)).

**20**    *Park v. Park*, 986 P.2d 205, 207 (Alaska 1999) (alteration in original) (quoting *Borchgrevink v. Borchgrevink*, 941 P.2d 132, 138-40, 137 n.2 (Alaska 1997)).

Helen argues was insufficiently analyzed, the master referred to it only by noting that the evidence of domestic violence perpetrated *by Helen herself* was insufficient to show that she had "a demonstrated history of perpe[rating] domestic violence such that the presumption against custody should be applied."[21] Helen presumably does not challenge this favorable finding on appeal, and in her brief she fails to identify any evidence of domestic violence on Breandan's part that the court failed to consider.

In sum, we see no clear error in the superior court's factual findings, nor do we see any abuse of discretion in its custody award. The evidence supported the findings that Helen could not meet the children's needs at the time and that it was in the children's best interests that Breandan have sole legal and primary physical custody.[22] The master acted within her role as fact-finder when she gave more weight to Helen's mother's testimony than to the testimony of others, and we give particular deference to those factual findings that rely on assessments of witness credibility.[23] The superior court's de novo review of the evidence resulted in the same award of custody as the master's. Because that conclusion is reasonable and supported by the record, the custody award was not an abuse of discretion.

### B.  The Superior Court Did Not Abuse Its Discretion By Awarding Helen Only Limited Supervised Visitation.

Finally, Helen challenges the directive that her visitation be supervised. The master found that unsupervised visitation would "likely adversely affect the

---

[21] *See* AS 25.24.150(j) (providing that parent found to have "history of perpetrating domestic violence" shall be allowed only supervised visitation pending parent's completion of batterers' intervention and parenting education programs).

[22] *See Peterson*, 214 P.3d at 337 (Alaska 2009) ("The decision to award sole legal custody to [the father] was based on a finding that [he] was more able to make good decisions for the child; this is a valid factor to rely on in awarding sole legal custody.").

[23] *Sheffield v. Sheffield*, 265 P.3d 332, 335 (Alaska 2011).

children's . . . wellbeing," but she proposed a plan — adopted by the superior court — by which Helen "could progress to unsupervised visitation." The plan required Helen to complete a comprehensive psychological evaluation, follow all recommendations from that evaluation and other "therapeutic intervention," and be "consistent in her visitation with the children." Helen's primary objections to the visitation order are (1) that the court failed to support it "with findings that specify how unsupervised visitation will adversely affect the child[ren]'s . . . well-being," and (2) that the order was "too vague" and contained insufficiently detailed guidelines.

As Helen correctly points out, it is "the norm" for a parent to have unrestricted, unsupervised visits with a child.[24] "If a court orders supervised visitation, its decision 'must be supported by findings that specify how unsupervised visitation will adversely affect the child's physical, emotional, mental, religious, and social well-being.' "[25] And if supervised visitation is temporarily required, "absent a compelling reason to the contrary that is supported by the record, the court must establish a plan or criteria for ending the supervision requirement."[26]

The order under review complied with these requirements. The superior court adopted the master's explicit finding that unsupervised visitation would adversely affect the children's wellbeing, reasoning that Helen's "mental instability and inability to accept and seek appropriate treatment for her mental illness [are] likely to lead to continued instability for her and[,] by extension, her children," who "are fairly young and vulnerable, and are unable to protect themselves should . . . [Helen] attempt to leave

---

[24]     *J.F.E. v. J.A.S.*, 930 P.2d 409, 409 (Alaska 1996).

[25]     *Frackman v. Enzor*, 327 P.3d 878, 884 (Alaska 2014) (quoting *J.F.E.*, 930 P.2d at 413-14); *see also Yelena R. v. George R.*, 326 P.3d 989, 1003 (Alaska 2014) (holding that "it was error for the superior court not to make express findings that specified why unsupervised visitation would adversely affect the children's well being").

[26]     *Yelena R.*, 326 P.3d at 1003.

the state with [them]." These observations have significant support in the evidence. For example, among other incidents, Breandan's partner testified that in July of 2021 Helen returned to Alaska without notifying anyone, went to her and Breandan's residence and demanded to speak with the children (who were not there at the time), then refused to leave the area.

The superior court was within its discretion to credit this testimony and to conclude that visitation should be supervised, at least for the time being. And the plan the court laid out for achieving unsupervised visitation was specific enough to inform Helen of what she needed to do: get a psychological evaluation, follow the evaluator's recommendations, and be consistent in her visitation with the children.[27] We see no abuse of discretion.[28]

## V. CONCLUSION

We AFFIRM the superior court's order modifying custody and visitation.

---

[27] *See Fardig v. Fardig*, 56 P.3d 9, 14-15 (Alaska 2002) ("[W]e prefer that a court ordering supervised visitation also specify a plan by which unsupervised visitation can be achieved." (quoting *Monette v. Hoff*, 958 P.2d 434, 437 (Alaska 1998))); *Matthew P. v. Gail S.*, 354 P.3d 1044, 1051 (Alaska 2015) (ruling that making unsupervised visitation contingent on a psychological assessment was acceptable because, "if the assessment reveals [the parent] has no mental health issues requiring treatment or counseling, then — assuming [the parent] complies with the court's other requirements — [the parent] can move the court for unsupervised visitation").

[28] Helen argued in her brief that the superior court violated her due process rights by, among other things, prohibiting her from communicating with Breandan except by text message to arrange visitation. She conceded at oral argument that these issues were moot, and we therefore decline to address them.